TOBACCO (UNITED STATES v.). See Case No. 16,527.

TOBACCO FACTORY (UNITED STATES v.). See Case No. 16,528.

———

## Case No. 14,065.

TOBEY v. COUNTY OF BRISTOL et al.

[3 Story, 800.] [1]

Circuit Court, D. Massachusetts. May Term, 1845.

COUNTIES — AGREEMENT TO ARBITRATE CLAIM — LEGISLATIVE ACT—REVOCATION—COURTS— CONCURRENT JURISDICTION.

1. Where the legislature of Massachusetts passed a resolve, authorizing the county commissioners of Bristol to examine the claims of the plaintiff against the county, and to make him proper allowances therefor; and also to refer his claims to the determination of arbitrators mutually chosen by themselves and the plaintiff, which determination should be final; and afterward, accordingly, the plaintiff presented his petition to the county commissioners, praying them to refer all his claims to arbitrators, and they passed an order to refer certain of his claims, but not all, to which the plaintiff declined to accede, and brought the present bill to compel the commissioners to refer the whole of his claims, and to agree upon arbitrators selected from the schedule of persons offered by the plaintiff,— it was *held*, that the commissioners had no authority under the resolve to submit a part of the plaintiff's claims, without submitting all.

2. The act of the commissioners, in executing the authority under the resolve, was not founded in a contract, but was an exercise of judicial functions.

3. Were it otherwise, a court of equity would not enforce an agreement to submit a question to arbitration; and the present case was not one, in which a specific performance could be

decreed, since such a decree might be both impracticable and inequitable.

[Cited in Tufts v. Tufts, Case No. 14,233.]

[Cited in Corbin v. Adams, 76 Va. 61.]

4. The proper remedy of the plaintiff against the defendants for a refusal to act judicially under the resolve, was by mandamus.

[Cited in Coles v. Peck, 96 Ind. 341.]

5. This court, as a court of equity, possesses no revisory power over the state courts, in the exercise of their jurisdiction.

6. An agreement to submit a question to arbitration will not be enforced in equity, but must depend on the good faith and honor of the parties; but an award under such an agreement will be enforced.

[Cited in Laflin v. Chicago, W. & N. Ry. Co., 34 Fed. 864.]

[Cited in Chamberlain v. Connecticut Cent. R. R., 54 Conn. 487, 9 Atl. 244; Knaus v. Jenkins, 40 N. J. Law, 293; Noyes v. Marsh, 123 Mass. 287; Pearl v. Harris, 121 Mass. 393; Sanford v. Commercial Travelers' Mut. Acc. Ass'n (Sup.) 33 N. Y. Supp. 513.]

7. Courts of equity never enforce the specific performance of any agreement, where the decree would be a vain and imperfect act, or where the specific performance might be productive of injustice to the parties.

[Cited in Tufts v. Tufts, Case No. 14,233; Tscheider v. Biddle, Id. 14,210.]

[Cited in Danforth v. Philadelphia & C. M. Ry. Co., 30 N. J. Eq. 16; Knaus v. Jenkins, 40 N. J. Law, 293; Werden v. Graham, 107 Ill. 180.]

8. An agreement to submit a matter to arbitration, is, both at law and in equity, revocable before the award is given, but not afterward; and it cannot be made irrevocable by any agreement of the parties.

[Cited in Guaranty Trust & Safe Deposit Co. v. Green Cove Springs & M. R. Co., 139 U. S. 143, 11 Sup. Ct. 514; Rowe v. Williams, 97 Mass. 166.]

9. The specific performance of an agreement is not a matter of right, which a party can demand from a court of equity, but is merely a matter resting in the sound discretion of the court.

[Cited in Trott v. City Ins. Co., Case No. 14,-189; Hankinson v. Page, 31 Fed. 188.]

10. This court has ample power to entertain a cause over which the state court has jurisdiction, provided this court have full concurrent jurisdiction.

This was a bill in equity. The bill was amended at different times, and, as amended, in substance stated, that in the year 1838, Jonathan Tobey made a contract with the said county of Bristol, whereby he undertook to work, build and construct a public road in the said county, from the town of Taunton to the town of New Bedford, in consideration of a sum of money to be paid to the plaintiff by the said county, which contract was first made in behalf of the said county by their commissioners of highways, who at the same time engaged that the said road had been duly located by them, and the location thereof was afterwards ratified by the county commissioners of the said county. That, at the time of making the original contract, he agreed with the said commissioners to procure the location and construction of a highway in the county of Plymouth, Massachusetts, at his own proper charge, without

which the highway first mentioned would have been of no public utility; that by the neglect of the said commissioners of highways to cause their location of the said road to be duly recorded, the plaintiff experienced great inconveniences in working and constructing the said road, and for the same cause, was for a long time unable to procure the location and construction of the said highway in the said county of Plymouth, according to his said undertaking and agreement, in consideration whereof the said commissioners of highways undertook and promised the plaintiff that all damages, which should be or had been sustained by him, by reason of their neglect as aforesaid, should be made good to him, and that he should be paid for procuring the location of the said highway in the said county of Plymouth, and, in the mean time, the plaintiff diligently prosecuted the work of building the road first mentioned, and completed the same early in the year 1830; but by reason of the said neglect on the part of the said commissioners of highways as aforesaid, he was unable to procure the location and construction of the said highway in Plymouth county, until several years afterwards, and finally procured the same at a great sacrifice of time and of money, and to the postponement and injury of his own private affairs. That the county of Bristol did not pay the plaintiff for the said work and services, nor for the said damages, except as to a small part, and that, after repeated offers to submit the question to a board of arbitration, he finally was obliged to bring his action at law against the said commissioners, and after great expense and loss of time, and making great sacrifices to pay the debts he had incurred in making the said highway, he finally recovered judgment against the said county of Bristol, and also against the said commissioners of highways, which was assumed by the said county, and obtained payment for the greater part of his said claims for work and some of his services and expenditures; yet he never has been paid for all his damages occasioned by the said neglect of the said commissioners of highways as aforesaid, which have been very great and distressing, nor for his pecuniary losses and distresses by the grievous and unreasonable neglect of the said county of Bristol to pay him his just dues as finally settled in this court. That being fully convinced, that the said county of Bristol were bound in equity and conscience to make good to him his said damages, losses and expenditures, he exposed the whole subject before the legislature of the said commonwealth by a petition, by him preferred to that body, who, after a full hearing of the parties, passed a resolve for the relief of the plaintiff. That the county commissioners of the said county of Bristol, having been authorized by the said resolve to refer the said claims of the plaintiff to the determination of arbitrators, mutually to

be selected by them and the plaintiff, the plaintiff, on the 9th day of June, 1839, presented his said claim against the said county of Bristol, to the county commissioners of the said county, for the year aforesaid, then in session, and thereupon an agreement was entered into between your orator and the said commissioners to refer the same to the arbitrament and final award of Theron Metcalf, John W. Lincoln and Artemas Hale, Esquires; but the schedule of the said claims not having been annexed, was lost by accident, and not by any fault of the plaintiff, and thereupon the plaintiff drew up another schedule thereof, to be annexed to the said agreement, and offered the same to the said commissioners for that purpose, but which they declined receiving, and insisted upon a copy of the original claim and schedule, which it was not in the power of the plaintiff to make, as it was drawn up by his counsel, and no copy was preserved. After considerable delay and ineffectual attempts on the part of the plaintiff to have the said reference proceed, he, on the 7th day of July, 1840, made and presented to the said commissioners his petition, by which he recapitulated the circumstances of the loss of the said schedule, and offered to submit his claims as then and before presented, to the said referees, and further offering to enter into an additional agreement, by which all the circumstances attending the said loss, should be also submitted to the consideration of the said referees, but that the said plaintiff and the said county commissioners and the said county declined and refused to accept the said offer and complete the said agreement, pretending that Leonard Tobey, a brother of the said plaintiff, had been induced by the plaintiff to write to one of the said referees, John W. Lincoln, and to request him to decline serving as a referee in the case. Whereas the plaintiff then declared, and now declares, that if any such letter was written, it was written without his knowledge, request or assent, that he had no agency whatever in causing it to be written, but was desirous that the said referees should proceed to arbitrate and award, respecting said claims. And that afterwards, May 22nd, 1842, at a meeting of said commissioners, preferred to them his petition in writing, and therewith also a full account of his said claim, and calling their attention to the said resolve, respectfully requested them to agree to refer all his said claims to disinterested men, that the same might be finally settled and disposed of. And the said commissioners, after a full hearing by counsel, both on behalf of the said county, and on behalf of the plaintiff, took time to advise thereupon, and at their meeting in the month of September, of the same year, resolved and agreed to grant the prayer of the plaintiff's said petition, and to refer the said claims to the determination of arbitrators, to be mutually chosen in pursuance of the said resolve, and

caused the entry of their said resolve and agreement to be made upon their records, by James Sproat, the clerk of the said commissioners. That he thereupon presented to the said commissioners a paper containing the names and additions of persons in all respects qualified and suitable to be selected as such arbitrators, and requested the said commissioners to select three of the persons therein named as arbitrators, and having presented the same to the said commissioners, they agreed that they were suitable persons for such arbitrators, and that they would select from among them, three persons who should compose that board, and the plaintiff consented thereto. But that the said commissioners deferred making such selection, and on the 22nd day of November following, at a meeting of the said commissioners then held, they wholly declined and refused to make the said selection in pursuance of their resolve and agreement aforesaid, and passed a formal resolve by which they offered to refer a small portion of the plaintiff's said claims, and declared themselves ready to proceed to the said selection of arbitrators. That whatever was alleged to have been done by Leonard Tobey, a brother of the plaintiff, to induce the said failure, was wholly unauthorized by the plaintiff, and that it was wholly out of his power to make a copy of the original schedule of claims designed to be referred, and which was lost by accident. That on the 22nd day of the said November, the plaintiff again appeared before the said commissioners, and made his petition in writing, praying them to proceed to the selection of referees to hear and determine respecting the said claims, according to their agreement on the said twenty-second day of September. Whereupon the said commissioners agreed to make the said selection, upon condition that large portions of the said claims, specified in their agreement, should be excepted in the said reference, and not considered by the referees, and refused to proceed to such selection unless the plaintiff would accede to the said condition. But that the said commissioners, by an order then passed, wholly refused to proceed to the said selection, according to their said agreement; but declared themselves ready to proceed to the said selection, in order to arbitrate upon a part of the said claims only; and also, at their sittings in the month of August, one thousand eight hundred and forty-three, when again requested by the plaintiff to proceed to the said selection of referees, the said commissioners again declared their willingness to proceed to such selection only upon the same condition, that is to say, to arbitrate a part only of the plaintiff's claims.

The bill prays, that the said county of Bristol may be compelled by the decree of this honorable court, specifically to perform their said agreement with the plaintiff, and that the said Whitmarsh, Brownell and Briggs, or their successors in the office of county commissioners for the said county, may be compelled, by the decree of this honorable court, to proceed to select from the schedule of the names of the persons so presented and delivered to them for that purpose, as aforesaid, by the plaintiff, three persons, to whose determination and final award, the said claims of the plaintiff may be referred, according to the provision of the resolve of the legislature of the commonwealth of Massachusetts, before referred to, the plaintiff hereby offering specifically to perform the said award on his part, and to submit his said claims, to the three persons whom the said commissioners shall select from the said schedule, according to his said agreement, and that the determination of the three persons so selected, shall be final and conclusive, upon all his claims against the said county: and that the plaintiff may have such further and other relief in the premises, as may seem meet and the circumstances of this case require.

The petition to the legislature, referred to in the bill, was as follows:

"To the Honorable Senate and House of Representatives of the Commonwealth of Massachusetts in General Court Assembled: Respectfully represents Jonathan Tobey, of Tiverton, in the county of Newport, and state of Rhode Island, that on the first day of January, A. D. 1828, he contracted with the county of Bristol, in the said Massachusetts, to make a road, then said by the highway commissioners of the said Bristol, to have been legally located by them, which, together with a contemplated new road in Plymouth county, would open a new and more eligible avenue from Taunton to New Bedford: and your petitioner at the same time undertook to procure the location of the contemplated part of the said road in Plymouth county. That by reason of an omission by the said commissioners of Bristol county, to record their said location of the said road, the same was illegal, and your petitioner was put to great expense and delay to procure the legal location of the said road in Plymouth county, and the working of the same. Whereupon the said original contract was mutually waived by your petitioner and the agents of the said Bristol county, and the commissioners thereof undertook and promised him to pay and indemnify him for all expenses, costs, charges, losses, delays and labors and additions by reason of the said omission to make a record as aforesaid. And your petitioner now alleges and shows that he has fully complied with all his undertakings in every particular, and that the said road is a very useful one for the county. But your petitioner shows that the said county did not perform their contracts, but for a long time delayed payment, and though the said road was accepted by the said county, in June, A. D. 1830, as being completely worked according to contract, your petition-

er was obliged to have recourse to suits at law, and obtained partial recompense by the verdicts of juries, in the circuit court for Massachusetts district. And now your petitioner represents that the long delay of payment on the part of the said county of Bristol and the said commissioners, has operated very injuriously upon him, and for the last ten years has kept him in perplexity and embarrassments, and that he has suffered great losses, which could not, by the rules of law, be inquired into and passed upon by the juries who tried his cases. That two law suits, one with the county, and another with the said commissioners, succeeded in obtaining for him but very partial compensation, since he has paid, for counsel fees and incidental charges, large sums of money, and his embarrassments, expenditures, time and labor growing out of the said omission of the said commissioners to make their said record, and for which they promised indemnity in full, have occasioned losses and damages to him far exceeding the amounts covered by the aforesaid judgments. And inasmuch as the present board of county commissioners do not feel authorized to indemnify your petitioner for his losses, expenditures, labor and delays aforesaid, and inasmuch as it may be doubtful how far they would be justified by law in so doing, your petitioner respectfully asks your honorable body to pass a resolve by which the county commissioners of Bristol county may be authorized to investigate the items of your petitioner's claims, and make an equitable settlement of the same on the part of the said county, with your petitioner, or, if they see fit, refer the same to the arbitrament and determination of such person or persons as may be mutually agreed upon by the said commissioners and your petitioner. And as in duty bound will ever pray."

The resolve of the legislature was as follows:

"Commonwealth of Massachusetts, in the Year One Thousand Eight Hundred and Thirty-Nine, Resolve on the Petition of Jonathan Tobey: Resolved, for the reasons set forth in the said petition, that the county commissioners of the county of Bristol be authorized to examine the claims which the said Jonathan Tobey alleges he has against the said county, and for which he has no legal or equitable remedy, and to make him such allowances therefor as to them may seem expedient, just, and right; and the said commissioners are further authorized, if they see fit, to refer the claims of the said Tobey to the determination of arbitrators mutually selected by themselves and the said Tobey; the decision of the said commissioners or of the said arbitrators in the premises to be final."

The original answer of the county was as follows:

"That they have been informed, and believe it to be true, that the said Tobey con-tracted with the inhabitants of the said county of Bristol, to build the highway in the said bill mentioned as lying within the limits of the said county of Bristol, and such acceptance was declared and recorded on the 29th day of June, in the year 1830. That the inhabitants of the said county of Bristol, through their duly constituted agents, deeming the claims made by the said Tobey, on account of the building of the said road, unfounded and unjust, declined to pay the same, and the same were the subject of an action at law, brought and tried in this honorable court. These respondents have no knowledge, belief, or information, save what is contained in the said bill, as to any proposition for any arbitration, such as is mentioned in the second interrogatory. That the said Tobey did bring an action at law against certain persons who formerly were county commissioners for the said county of Bristol, and these respondents crave leave to refer to the record of the said suit now remaining in this honorable court, as evidence of the cause of action and what was recovered therein. And the said county of Bristol had always, until the resolve of the legislature conferred on their agents authority to do so, refused to pay anything, either to the said Tobey or the said defendants who were sued by him, in the action last aforesaid, and after obtaining the authority so to do, by the resolve last aforesaid, they paid unto the said defendants the sum of $6503.08. That the said Tobey did present his petition to the legislature, but the respondents have no knowledge that the county commissioners of the county of Bristol were present before the committee when the same was heard, and when the resolve passed. Thomas A. Greene, Esq., one of the said commissioners, was a member of the legislature. That the said Tobey did present to the then county commissioners of Bristol county, some time in the year 1839, but the precise time is not now known to these respondents, his petition founded on the said last mentioned resolve, and also a statement of his claims, which differed materially from the statement afterward made by him and annexed to the said bill. And the said commissioners agreed to refer the said claim to the arbitration of three persons who were designated and agreed upon; but the said Tobey, or Leonard Tobey, a brother of the said Tobey, as your respondents are informed and believe, afterward carried away the said statement of claims, and the said Tobey, though requested, has ever since refused to restore the said statement, or to furnish one similar thereto. That the said Leonard Tobey, at the instigation, as your respondents believe, of the said Jonathan Tobey, after the said arbitration was agreed upon, wrote to John W. Lincoln, Esq., who was selected as one of the said arbitrators, requesting him not to act as referee in the said case. And no ar-

bitration was had in the said matter. That the said board of county commissioners did not act further on the petition of the said Tobey, and a similar petition came on to be heard before the present board, consisting of the persons who are named as defendants in the said bill.

"And these respondents further say, that after hearing and considering the petition of the said Tobey, the present board caused its clerk to make the following record: 'Jonathan Tobey now on this 22nd day of November, 1842, moves the hon. county commissioners to proceed to the selection of referees, to whom to refer the claims of Jonathan Tobey against the county of Bristol, according to the decision of this hon. court, made September term, 1842. On this motion, ordered that the commissioners will refer all claims which Jonathan Tobey has presented against the county of Bristol, excepting such claims as have been embraced in the said Tobey's suits against the said county, and against Noah Claflin and others, and also excepting all the claims the said Tobey has presented arising out of his prosecution of his suit against the said Noah Claflin and others, which said suits were instituted and prosecuted in the United States court, and are now ready to proceed to the selection of referees.' And these respondents deny that any other record has at any time been made by the order of the said board, or that the said board hath passed any other order or made any other assent respecting an agreement to refer the claims of the said Tobey, except what is shown in and by the record last aforesaid. And that they have no recollection that the said board of county commissioners ever declared that the names of persons presented by the said Tobey were the names of suitable persons for arbitrators, and they do not admit it to be true that the said board ever made any such declaration. And these respondents deny that the said board of county commissioners ever agreed, that they would select three of them to be arbitrators, as is mentioned in the said bill. These respondents admit, that the said board have declared, as appears in and by the said record, that part of the claims made by the said Tobey, ought not to be, and so far as the said board could determine, should not be submitted to arbitration. And the said board always has refused, and doth now refuse, to consent to any arbitration which shall embrace any such claims, deeming it unfit so to do. And these respondents say, that by force of the statute laws of the commonwealth of Massachusetts, and of the resolve of the legislature, it is left entirely to the discretion of the said board whether or no any arbitration whatever should take place: that it was not the intention of the legislature to subject the inhabitants of the county of Bristol to the payment of claims, which had no foundation, either in law or equity, as the said Tobey's claim avowedly had not, except by the free choice of the representatives of the said inhabitants, viz.: the said board of county commissioners. That it was not the will of the legislature to compel the said board either to agree to a reference or to select the arbitrators: that the first was to be done only if the said board saw fit, and the second by mutual consent; and they pray the judgment of this honorable court, whether the said board, acting in a judicial capacity, under and by virtue of the said resolve and of the statute laws of Massachusetts, can be compelled by the decree of this honorable court to exercise its discretion, or to refer the claims of the said Tobey annexed to the said bill, when the said board explicitly declares that it does not think it fit to do so. And these respondents further insist and submit to this honorable court, that the said board of county commissioners are created and established by, and hold their jurisdiction and authority under the statute laws of the commonwealth of Massachusetts, and under and by virtue of the law of that commonwealth, the supreme judicial court of that commonwealth has a general power of supervision and control over the said board, according to the course of the common law, by writ of mandamus and other proper process: and if it be true, as is alleged in the said bill, that it is fit and proper that the said board should be compelled to proceed to the selection of referees, (which these respondents deny,) the only proper means so to compel them is by a writ of mandamus, which affords a plain, adequate and complete remedy, according to the course of the common law. And these respondents further insist and submit that no agreement such as a court of equity can or will specifically enforce, is shown by the said bill. And these respondents further answering say, that the said board was induced to come to the decision which appears in this record, partly by reason of petitions from sundry inhabitants of the said county, in aid of the said petition to the said board, and these respondents are now informed and believe that signatures were obtained to the said petitions by the said Tobey by misrepresentations, to wit: that the said Tobey represented to signers of the said petitions that the said commissioners were desirous that such petition should be presented, and they crave leave to exhibit proof thereof if the same shall become material. And the respondents pray that they may be hence dismissed with their reasonable costs and charges in this behalf unjustly sustained."

The original answer of the county commissioners was exactly similar. The answers of the county to the amended bill were substantially as follows: They admit that on the 9th day of June, in the year 1839, the said Jonathan Tobey did present to the then county commissioners of the said county of Bristol, a claim against the said coun-

ty, and that an agreement was entered into between the said Tobey and the said commissioners to refer the same to the arbitration of Theron Metcalf, John W. Lincoln, and Artemas Hale, Esquires. And the defendants further answering say, that they are informed by the surviving members of the said board of county commissioners, and believe, that the claim then presented by the said Jonathan Tobey against the said county amounted only to between $10,000 and $11,000, and the said defendants are further informed and believe, that the said Tobey then said that this claim was all the claim he had against the said county. The defendants are further informed and believe that the then board of county commissioners, consisting of Thomas A. Greene, William Seaver and Elkanah Bates, in order that there might be an end to litigation between the parties, requested the said Tobey to give to the said county a release of all claims, except the said claim embraced in the said account, which was agreed to be referred. That such a release was drawn up and delivered to the said Tobey, or to Leonard Tobey, brother of the said Jonathan, to be signed and returned; that the said release was afterwards delivered to the said county commissioners, signed by the said Jonathan Tobey. The rule of reference was then signed by Thomas A. Greene, the chairman of the said board of county commissioners, and delivered with the other papers in the case, to Leonard Tobey, the brother of, and believed to be the authorized agent of, the said Jonathan Tobey, and that they have never since been returned, though requested so to do by this board of county commissioners, and that they are informed and believe, that until the month of February, 1840, no intimation was made to the said commissioners by the said Tobey or any one for him, that his said schedule of claims was lost. It was then stated that Leonard Tobey had lost the said bill or schedule of claims. That the said board of commissioners, as these defendants are informed and believe, then required of the said Jonathan Tobey, that he should satisfy the said commissioners by affidavit, of the loss of the said bill or schedule, and should prepare another as near like the former one as he could, and then state in what particulars he desired it amended. No part of this request or requisition was complied with on the part of the said Tobey, as these defendants are informed and believe. These defendants further say, that they are informed and believe, that at that time, the said Leonard Tobey had it in his power to supply the loss of the original bill, by furnishing one either precisely or substantially like it, but that he was not permitted to do so by the said Jonathan Tobey or by his counsel. These defendants further say, that they are informed and believe that the said Leonard Tobey acted in relation to the said Jonathan Tobey's claim and matters connect-

ed therewith, as the agent of the said Jonathan Tobey; and these defendants are further informed and believe, that the said Leonard Tobey has repeatedly stated that he could supply the loss of the said original schedule, or furnish one substantially like it, but his brother, Jonathan Tobey, or the said Jonathan Tobey's counsel, would not permit it to be done, or did not wish it to be done. The answers of the county commissioners to the amended bill were to the same effect.

Bartlett & Webster, for plaintiff.
B. R. Curtis, for defendants.

STORY, Circuit Justice. On the 30th of March, 1839, the legislature of Massachusetts passed the following resolve on the petition of Jonathan Tobey, the plaintiff in the present suit. "Resolved, for reasons set forth in the said petition, that the county commissioners of the county of Bristol be authorized to examine the claims, which the said Jonathan Tobey alleges he has against the said county, and for which he has no legal or equitable remedy, and to make him such allowances therefor as to them may seem expedient, just and right; and the said commissioners are further authorized, if they see fit, to refer the claims of the said Tobey to the determination of arbitrators, mutually selected by themselves and the said Tobey; the decision of the said commissioners, or of the several arbitrators, in the premises, to be final." It is obvious, that the design of this resolve was to clothe the commissioners with an authority which they did not before possess, and to enable him to have administered to him, against the county, some remedial redress for claims, for which he before had no legal or equitable remedy. Although the resolve is not very exact in its language, it would seem to have given to the commissioners the alternative of one of two courses; either of themselves to examine the whole of the claims of Tobey contemplated in the resolve, and to allow such of them as they might deem expedient, just or right; or to refer the whole of the same claims to arbitration, as the commissioners should deem fit; so that a final decision, in the one way or the other, should be made of all the premises. It does not seem to me that the resolve contemplated a partial arbitration of these claims, or a partial examination of them by the commissioners. The petition of Tobey, on which the resolve was founded, does not refer to any account or specific enumeration of the claims laid before the legislature. But doubtless the resolve was intended to apply to such claims only as Tobey then had or professed to have against the county. At the March term of the court of county commissioners, in 1842, at an adjournment of the court in May of the same year, Tobey presented his petition to the commissioners, stating that he had "a claim against the county of Bristol growing out of the construction of a road from Taunton to

New Bedford," and requesting "that his said claim and all his claims may be referred to disinterested men, that the same may be finally disposed of." From the testimony of the witness, Timothy G. Coffin, it appears, that the claims referred to in the petition, were those stated in the account B. annexed to the present bill in equity. The petition was continued to the September term of the court of commissioners in 1842, and after a hearing of the counsel for the petitioner, an entry was made on the docket of the court, apparently by order of the court, "Jonathan Tobey, petitioner for reference. Granted." There were several adjournments of the September term of the court; one on the 5th day of October, 1842, and another on the 22d of November, of the same year. At what precise time the above docket entry was made does not appear. But at the adjournment on the 22d of November, the following order was passed by the court. "Jonathan Tobey, now on the 22d of November, 1842, moves the hon. county commissioners to proceed to the selection of referees, to whom to refer the claims of Jonathan Tobey against the county of Bristol, according to the decision of the hon. court, made September term, 1842. On this motion, ordered, that the commissioners will refer all claims, which Jonathan Tobey has presented against the county of Bristol, excepting such claims as have been embraced in the said Tobey's suits against the said county, and against Noah Claflin and others, and also excepting all the claims the said Tobey has presented arising out of his prosecution of his suit against the said Noah Claflin and others, which said suits were instituted and prosecuted in the United States court, and are now ready to proceed to the selection of the referees." To any arbitration, with such exceptions, Tobey declined to accede; and the present bill is brought to compel the county commissioners, by injunction or otherwise, to agree to arbitrators to be selected from the schedule of persons offered by the plaintiff, and, under the prayer for general relief, for the appointment by mutual consent, of other persons as arbitrators, if the list so offered is not acceptable. Pending the proceedings in this court, one of the county commissioners has gone out of office, and a new commissioner has been appointed in his stead; and it is admitted, that the suit cannot be finally disposed of without his being made a party. But this objection being merely in its nature dilatory only, and not ending the proceedings, but only requiring a supplemental bill, the parties have been content to argue the cause upon what is, after all, the main question to be decided. And that question is, whether this court, as a court of equity, possesses authority to compel the county commissioners to submit to any arbitration, under the circumstances of the case.

Before proceeding directly to this question, it may be well to dispose of some considerations stated at the argument, in a brief manner. The final order of the county commissioners makes certain exceptions from the claims of the plaintiff, which they offer to submit to arbitration. Now, in my judgment, if any of the excepted claims were, in fact, in the contemplation of the resolve of 1839, the commissioners have no authority, under the resolve, to submit a part of them only, to arbitration; but are bound to submit the whole, if any. Of course, as has been already intimated, if any of the claims are new, and are not comprehended in the resolve, they would not fall within the same predicament; but would constitute a good ground why the submission of them to arbitration should be declined. In respect to another point made at the bar, that a sufficient and appropriate remedy, if any lies, will lie in the state court by way of mandamus; that is certainly a consideration entitled to much weight, if the entertaining of the present bill be a matter solely for the exercise of the sound discretion of this court. But if the case be one over which this court possesses a full jurisdiction, and the party has rights, which he is entitled to have protected by its authority, I do not know that the existence of a concurrent jurisdiction in the state court would authorize this court to decline jurisdiction over the cause.

The grave question is, whether this court, as a court of equity, does possess jurisdiction to compel the defendants to submit the claims of the plaintiff to arbitration, under the circumstances of the present case. I observe, that at the argument, the case has been treated by the plaintiff's counsel as a matter of contract or agreement on the part of the commissioners, to submit the claims to arbitration; and that when the court, upon petition of Tobey, entered upon their docket, through their clerk, "Granted," it amounted to a consummated agreement to refer the same, and nothing remained but mutually to agree upon the arbitrators. But I entertain great doubts upon both parts of the proposition. In the first place, an agreement to refer without saying more, how, and when, and to whom the submission is to be, can hardly be deemed anything more than an inchoate and imperfect agreement, the first step, only, in a negotiation, which is to fall of itself, if the arbitrators are not subsequently agreed upon. It is rather of the nature of a conditional consent to refer, provided the parties can agree upon the arbitrators. In the next place, it does not seem to me that the act of the commissioners in executing this authority, is to be treated as founded upon, or constituting of itself; any contract or agreement whatsoever. It is an exercise by them of a public special authority, confided to them by the resolve, not as individuals, but as a court, and acting as a court. No one can reasonably doubt, that the authority to examine and allow the claims is to be in the exercise of judicial functions, by the commissioners, as much

so as the laying out of a highway, or the award of a committee or jury, to ascertain the amount of the damages. The commissioners were not by the resolve authorized, in terms, to make any contract or agreement, nor were they personally bound by any award made by the arbitrators, if duly chosen. But the award would bind the county, not upon the footing of being a contract or agreement made by the commissioners, for and on behalf of the county, but by mere operation of law, as a legal liability, imposed upon the county as a public corporation, independent of contract or agreement, under and in virtue of the resolve. But supposing it to be otherwise, and here there was a real contract or agreement, not conditional but absolute, on the part of the commissioners, to refer the claims to arbitration, can such an agreement be enforced by a court of equity? No one can be found, as I believe, and at all events, no case has been cited by counsel, or has fallen within the scope of my researches, in which an agreement to refer a claim to arbitration, has ever been specifically enforced in equity. So far as the authorities go, they are altogether the other way. The cases are divided into two classes. One, where an agreement to refer to arbitration has been set up as a defence to a suit at law, as well as in equity; the other, where the party as plaintiff has sought to enforce such an agreement in a court of equity. Both classes have shared the same fate. The courts have refused to allow the former as a bar or defence against the suit; and have declined to enforce the latter as ill-founded in point of jurisdiction. In respect to the former class, I will barely refer to Wellington v. Mackintosh, 2 Atk. 569; Mitchell v. Harris, 4 Brown, Ch. 311, 2 Ves. Jr. 129; Kill v. Hollister, 1 Wils. 129; Street v. Rigby, 6 Ves. 815; and Thompson v. Charnock, 8 Term R. 139. In respect to the latter class: In Street v. Rigby, 6 Ves. 813, 818, Lord Eldon significantly said, that no instance is to be found of a decree for specific performance of an agreement to name arbitrators, or that any discussion upon it has taken place in experience for the last twenty-five years; and he referred to the case of Price v. Williams, 3 Brown, Ch. 163, before Lord Thurlow, in which he, Lord Eldon, was counsel, where Lord Thurlow held, that the court could not perform such an agreement. I do not find in the very brief and unsatisfactory reports of the case of Price v. Williams. Id., and 1 Ves. Jr. 365, any notice of this point; but there cannot be any serious doubt of the accuracy of Lord Eldon's recollection of the case. In Gourlay v. Duke of Somerset, 19 Ves. 430, Sir William Grant, one of the greatest masters of equity of his age, expressly said, that a bill seeking to enforce the specific performance of an agreement to refer to arbitration, was a spe-

cies of bill that has never been entertained by a court of equity. There are several other cases bearing strongly on the same doctrine, such as Milnes v. Gery, 14 Ves. 400; Blundell v. Brettargh, 17 Ves. 232; and Wilks v. Davis, 3 Mer. 507. But a later case, directly in point, is Agar v. Macklew, 2 Sim. & S. 418, where Sir John Leach utterly refused to decree the specific performance of an agreement to refer to arbitration. On that occasion, he said: "I consider it to be quite settled, that this court will not entertain a bill for the specific performance of an agreement to refer to arbitration; nor will it, in such a case, substitute the master for the arbitrators, which would be to bind the parties contrary to their agreement."

It was suggested at the argument, that the ground upon which this doctrine of courts of equity is founded, is not solid or satisfactory. If this were admitted to be true. I do not know that any judge would now deem it correct or safe to depart from it, as he must content himself upon this, as many other occasions, to administer the established law, and walk in the footsteps of his predecessors, super antiquas vias. But, in truth, I do not well see, that the doctrine could have been otherwise settled. The two general grounds on which it rests, belong to other branches of equity jurisprudence as well as this. What are they? The first ground is, that a court of equity ought not to compel a party to submit the decision of his rights to a tribunal, which confessedly, does not possess full, adequate, and complete means, within itself, to investigate the merits of the case, and to administer justice. The common tribunals of the country do possess these means; and although a party may have entered into an agreement to submit his rights to arbitration, this furnishes no reason for a court of equity to deprive him of the right to withdraw from such agreement, and thus to take from him the locus penitentiæ; and to declare that the common tribunals of the country shall be closed against him, and he shall be compelled to submit all his rights and interests to the decision of another tribunal, however defective or imperfect it may be, to administer entire justice. The argument at the bar misconceived the doctrine of the court on this head. Courts of equity do not refuse to interfere to compel a party specifically to perform an agreement to refer to arbitration, because they wish to discourage arbitrations, as against public policy. On the contrary, they have and can have no just objection to these domestic forums, and will enforce, and promptly interfere to enforce their awards when fairly and lawfully made, without hesitation or question. But when they are asked to proceed farther and to compel the parties to appoint arbitrators whose award shall be final, they necessarily pause to consider, whether such tribunals possess adequate means of giving redress, and whether they

have a right to compel a reluctant party to submit to such a tribunal, and to close against him the doors of the common courts of justice, provided by the government to protect rights and to redress wrongs. One of the established principles of courts of equity is, not to entertain a bill for the specific performance of any agreement, where it is doubtful whether it may not thereby become the instrument of injustice, or to deprive parties of rights which they are otherwise fairly entitled to have protected. The specific performance of an agreement is, by no means, a matter of right which a party has authority to demand from a court of equity. So far from this, it is a matter of sound discretion in the court, to be granted or withheld, according to its own view of the merits and circumstances of the particular case, and never amounts to a peremptory duty. Now we all know, that arbitrators, at the common law, possess no authority whatsoever, even to administer an oath, or to compel the attendance of witnesses. They cannot compel the production of documents, and papers and books of account, or insist upon a discovery of facts from the parties under oath. They are not ordinarily well enough acquainted with the principles of law or equity, to administer either effectually, in complicated cases; and hence it has often been said, that the judgment of arbitrators is but rusticum judicium. Ought then a court of equity to compel a resort to such a tribunal, by which, however honest and intelligent, it can in no case be clear that the real legal or equitable rights of the parties can be fully ascertained or perfectly protected?

It his been said at the bar, that in modern times, most nations, and especially commercial nations, not only favor arbitrations, but in many instances make them compulsive. But in considering this point, two circumstances are important to be kept in view. In the first place, whenever arbitrations are made compulsive, it is by legislative authority, which at the same time, arms the arbitrators with the fullest powers to ascertain the facts, to compel the attendance of witnesses, to require discovery of papers, books and accounts, and generally, also, to compel the parties to submit themselves to examination under oath. In the next place, these arbitrations are never, or at least not ordinarily, made compulsive to the extent of excluding the jurisdiction of the regular courts of justice; but are instituted as mere preliminaries to an appeal to those courts, from the award of the arbitrators, if either party desires it, so that the law, and in many cases, the facts also, if disputed, are re-examinable there. So that, in many cases, it will be found, that protracted litigation and very onerous expenses often follow as necessary results of the system. Indeed, so far as the system of compulsive arbitrations has been tried in America, the experiment has not, as I understand, been such as to make any favorable impression upon the public mind, as to its utility or convenience. At all events, it cannot be correctly said, that public policy, in our age, generally favors or encourages arbitrations, which are to be final and conclusive, to an extent beyond that which belongs to the ordinary operations of the common law. It is certainly the policy of the common law, not to compel men to submit their rights and interests to arbitration, or to enforce agreements for such a purpose. Nay, the common law goes farther, and even if a submission has been made to arbitrators, who are named, by deed or otherwise, with an express stipulation, that the submission shall be irrevocable, it still is revocable and countermandable, by either party, before the award is actually made, although not afterwards. This was decided as long ago as in Vynior's Case, 8 Coke, 81b. The reason there given, is, that a man cannot, by his act, make such authority, power, or warrant not countermandable, which is by law, and of its own nature, countermandable; as if a man should, by express words, declare his testament to be irrevocable, yet he may revoke it, for his acts or words cannot alter the judgment of law, to make that irrevocable, which is of its own nature revocable. This doctrine has been constantly upheld down to the present day, as will appear from the cases of Milne v. Gratrix, 7 East. 607; Clapham v. Higham, 1 Bing. 89; King v. Joseph, 5 Taunt. 452. But where an award has been made before the revocation, it will be held obligatory, and the parties will not be allowed to revoke it, and the courts of law as well as of equity will enforce it. In this view of the matter, courts of equity do but follow out the dictates and analogies of the law. When the law has declared, that any agreement for an arbitration is, in its very nature, revocable, and cannot be made irrevocable by any agreement of the parties, courts of equity are bound to respect this interposition, and are not at liberty to decree that to be positive and absolute in its obligation, which the law declares to be conditional and countermandable.

And this leads me to remark in the second place, that it is an established principle of courts of equity never to enforce the specific performance of any agreement, where it would be a vain and imperfect act, or where a specific performance is from the very nature and character of the agreement, impracticable or inequitable, to be enforced. 2 Story, Eq. Jur. § 959a. Thus, for example, courts of equity will not decree the specific performance of an agreement for a partnership in business, where it is to be merely doing the pleasure of both parties, because it may be forthwith dissolved by either party. See Story, Partn. §§ 189, 190, and Colly. Partn. (2d Ed.) bk. 2, pp. 132, 133, c. 2, § 2; 1 Story, Eq. Jur.

§ 666, and the cases there cited; Crawshay v. Maule, 1 Swanst. 515, the reporter's note. So, upon the like ground, courts of equity will not decree the specific performance of a contract by an author to write dramatic performances for a particular theatre, although it will restrain him from writing for another theatre, if he has contracted not to do so (2 Story, Eq. Jur. § 959a; Morris v. Colman, 18 Ves. 437; Clarke v. Price, 3 Wils. Ch. 157; Baldwin v. Society for Diffusion of Useful Knowledge, 9 Sim. 393); nor will they compel the specific performance of a contract by an actor to act a specified number of nights at a particular theatre (Kemble v. Kean, 6 Sim. 333); nor will they compel the specific performance of a contract to furnish maps to be engraved and published by the other party (Baldwin v. Society for Diffusion of Useful Knowledge, 9 Sim. 393). In all these cases the reason is the same, the utter inadequacy of the means of the court to enforce the due performance of such a contract. The same principle would apply to the case of a specific contract by a master to paint an historical picture, or a contract by a sculptor to carve a statue or a group, historical or otherwise. From their very nature, all such contracts must depend for their due execution, upon the skill, and will, and honor of the contracting party. Now this very reasoning applies with equal force to the case at bar. How can a court of equity compel the respective parties to name arbitrators; and a fortiori, how can it compel the parties mutually to select arbitrators, since each much, in such a case, agree to all the arbitrators? If one party refuses to name an arbitrator, how is the court to compel him to name one? If an arbitrator is named by one party, how is the court to ascertain, if the other party objects to him, whether he is right or wrong in his objection? If one party names an arbitrator, who will not act, how can the court compel him to select another? If one party names an arbitrator not agreed to by the other, how is the court to find out what are his reasons for refusing? If one party names an arbitrator whom the other deems incompetent, how is the court to decide upon the question of his competency? Take the present case, where the arbitrators are to be mutually selected, when and within what time are they to be appointed? How many shall they be,—two, three, four, five, seven, ten, or even twenty? The resolve is silent as to the number. Can the court fix the number, if the parties do not agree upon it? That would be doing what has never yet been done. If either party should refuse to name any arbitrator, or to agree upon any named by the other side, has the court authority, of itself, to appoint arbitrators, or to substitute a master for them? That would be, as Sir John Leach said in Agar v. Macklen, 2 Sim. & S. 418, 423, to bind the parties contrary to their agreement; and in Milnes v. Gery, 14 Ves. 400, 408, Sir

William Grant held such an appointment to be clearly beyond the authority of the court. In Wilks v. Davis, 3 Mer. 507, 509, Lord Eldon referring to the cases of Cooth v. Jackson, 6 Ves. 34; Milnes v. Gery, 14 Ves. 400, 408; and Blundell v. Brettargh, 17 Ves. 232, —said: "It has been determined in the cases referred to, that if one party agrees to sell and another to purchase, at a price to be settled by arbitrators named by the parties, if no award has been made, the court cannot decree respecting it." In Cooth v. Jackson, 6 Ves. 34, Lord Eldon said: "I am not aware of a case even at law, nor that a court of equity has ever entertained this jurisdiction, that where a reference has been made to arbitration and the judgment of the arbitrators is not given in the time and manner according to the agreement, the court have substituted themselves for the arbitrators and made the award. I am not aware that it has been done even in a case where the substantial thing to be done is agreed between the parties, but the time and manner in which it is to be done, is that which they have put upon others to execute." The same learned judge, in Blundell v. Brettargh, 17 Ves. 232, 242, affirmed the same statement, substituting only the word "prescribe" for "execute." So that we abundantly see, that the very impracticability of compelling the parties to name arbitrators, or upon their default, for the court to appoint them, constitutes, and must forever constitute, a complete bar to any attempt on the part of a court of equity to compel the specific performance of any agreement to refer to arbitration. It is essentially, in its very nature and character, an agreement which must rest in the good faith and honor of the parties, and like an agreement to paint a picture, or to carve a statue, or to write a book, or to invent patterns for prints, must be left to the conscience of the parties, or to such remedy in damages for the breach thereof, as the law has provided.

There is another consideration, which is entitled to great weight, under the circumstances of the present case, which has been already alluded to. It is, that if the authority was confided to the commissioners, as a court, and they were to act judicially under the resolve, it seems to me, that if they refused to act, and it was not a matter left in their mere discretion, the appropriate remedy lies in the supreme court of the state, as the appellate jurisdiction competent to compel inferior tribunals to do their duty; and the fit remedy would be by mandamus. This court, as a court of equity, possesses no revisory power over the acts of the state tribunals in the exercise of their jurisdiction. It has no authority to compel them to do their duty, or to abstain from the exercise of their functions. It belongs ad alium examen.

Without going more at large into the subject, it appears to me, that the present is not a case in which this court can afford any

relief whatsoever to the plaintiff, however strong his claims may be upon the justice of the county and its public functionaries. I shall, therefore, order the bill to be discharged, but without costs to the defendants.