**SIMMONS CO. et al. v. CREW et al.**
**No. 3981.**

Circuit Court of Appeals, Fourth Circuit.
June 8, 1936.

Richard C. Kelly, of Greensboro, N. C. (Julian R. Allsbrook, of Roanoke Rapids, N. C., and Burke & Burke, of Taylorsville, N. C., on the brief), for appellants.

E. L. Travis, of Halifax, N. C., and George C. Green, of Weldon, N. C., for appellees.

Before PARKER, NORTHCOTT, and SOPER, Circuit Judges.

NORTHCOTT, Circuit Judge.

This is a suit in equity brought in August, 1935, in the superior court of Halifax county, N. C., by the appellees, herein referred to as the plaintiffs, against the appellants, herein referred to as the defendants. The original complaint was filed on August 30, 1935, and a temporary restraining order was issued in the superior court enjoining the defendants from disposing of or transferring on the books of the bank certain stock in the Roanoke Bank & Trust Company. On September 6, 1935, the defendant Simmons Company filed a petition to remove the cause to the District Court of the United States for the Eastern District of North Carolina, and on September 18, 1935, the judge of the superior court, after making certain findings of fact, among which was a finding that the defendants Roanoke Bank & Trust Company, S. T. Peace, H. E. Lee, and W. A. Thorne were immaterial, unnecessary, and improper parties to the controversy, and that their joinder as codefendants was fraudulently made for the purpose of defeating the jurisdiction of the District Court of the United States, entered an order removing the cause to the federal court.

On September 24, 1935, the defendant Simmons Company moved to dismiss the bill of complaint, and the judge of the district court set down the motion for hearing on the 21st day of October, 1935. On October 16th the defendants filed a motion to dismiss the temporary restraining order. On October 21, 1935, upon motion of the plaintiffs, an order was entered allowing the plaintiffs to amend their bill of complaint.

On October 22, 1935, a decree was entered in the court below granting a temporary restraining order enjoining the defendants from disposing of the stock in question, to which decree the defendants excepted and moved to dismiss the amended bill of complaint.

On October 28, 1935, the defendants moved to dissolve the temporary restraining order, and on the same day the plaintiffs again moved for leave to file amendments to their amended bill of complaint, which leave to amend was granted by the court.

On October 28, 1935, after a hearing, the District Judge entered an order granting an interlocutory injunction restraining and enjoining the defendants, during the pendency of the suit, from selling, disposing of, or transferring on the books of the Roanoke Bank & Trust Company any of the stock in question, from which action this appeal was brought.

The plaintiffs are J. W. Crew, Sr., and J. Winfield Crew, Jr., father and son, of near Roanoke Rapids, N. C., where they are engaged in the banking business. The defendant Simmons Company is a Delaware corporation, having an office in the city of New York, and the defendant Roanoke Bank & Trust Company is a North Carolina banking corporation, with its principal office in the town of Roanoke Rapids, N. C. The defendant S. T. Peace is the president and the defendants W. A. Thorne and H. E. Lee are cashiers of the Roanoke Bank & Trust Company.

The bill, as finally amended, alleges that on August 14, 1935, J. Winfield Crew, Jr., acting for himself and his father, went to New York at the request of the Simmons Company to negotiate with that company for the purchase of its stock in the bank; that the Simmons Company owned all of the common stock ($50,000) of said bank and the $10,000 preferred B stock; that $60,000 of preferred A stock was owned by the Reconstruction Finance Corporation; that on the visit of Crew, Jr., to New York the Simmons Company, through one Terrell, managing vice president of Simmons Company, gave the plaintiffs a verbal option on the stock owned by the Simmons Company until September 19, 1935, at the price of $117,042.60; that it was stipulated as part of said agreement that Crew, Jr., should return to Roanoke Rapids and make investigation of the assets, real and personal, and the liabilities of said bank in order to determine the real value of the stock of said corporation; that it was agreed that the Simmons Company would afford the plaintiffs opportunity of examining the assets of the bank and also ascertain definitely the liabilities of said bank in order to determine the real value

of the stock of said institution; that it was further agreed that, if the assets of the bank should not be worth the sum of $117,042.60 as reflected on the books of said bank, "Alfred Terrell, managing vice-president of Simmons Company, would come to Roanoke Rapids, N. C., and together with J. W. Crew, Sr., should determine the reasonable and fair market value of the real estate, banking houses and fixtures owned by said bank and if it was found to be less than it was carried on the books of said bank that there would be a diminution in the price of $117,042.60 to the extent that the value of said real estate was found by the aforesaid parties to be less than it was carried on the books of said bank"; that it was agreed that, if it were found upon investigation that there were worthless assets in the form of notes or other credits of said bank, there would likewise be pro tanto a diminution of the option price; that, in the event that Crew, Sr., and Terrell, acting for the Simmons Company, could not agree on values, a third party, to be selected by them, should be called in and ascertain said values for the purposes of the contract; that, relying upon the promise of Simmons Company, the plaintiffs, at considerable expense in money, time, and labor, proceeded to investigate so far as was known to them the values of the real property held by the Roanoke Bank & Trust Company; that defendant Peace failed to furnish the information desired by the plaintiffs, and refused them the opportunity of investigating the books of the bank; that the said Alfred Terrell came to Roanoke Rapids on August 28, and, after consulting with defendant Peace, came to see Crew, Jr., and informed him that they had decided not to comply with the option; that the stock in question was of peculiar value to the plaintiffs, and that they would be irreparably damaged by the failure of the defendant Simmons Company to comply with its contract of option; and that the plaintiffs were ready, able and willing to purchase said stock at the option price, less the deductions to be made in accordance with the provisions of the contract.

■ An appeal from an interlocutory injunction ordinarily brings up nothing for review but the question whether the judge below in granting the injunction has abused his discretion. Lea et al. v. Vasco Products, Inc. (C.C.A.) 81 F.(2d) 1011, and authorities there cited; Alabama v. United States, 279 U.S. 229, 49 S.Ct. 266, 73 L. Ed. 675; South Carolina Power Co. v. South Carolina Tax Commission, 286 U. S. 525, 52 S.Ct. 494, 76 L.Ed. 1268; Binford v. J. H. McLeaish & Co., 284 U.S. 598, 52 S.Ct. 207, 76 L.Ed. 513; United Drug Co. v. Washburn, 284 U.S. 593, 52 S.Ct. 202, 76 L.Ed. 511; United Fuel Gas Co. v. Public Service Commission, 278 U. S. 322, 49 S.Ct. 157, 73 L.Ed. 402; Meccano, Limited, v. John Wanamaker, 253 U. S. 136, 40 S.Ct. 463, 64 L.Ed. 822.

■ If the facts stated in the bill, fully conceded, would entitle plaintiffs to a decree, it is apparent that the judge below could not have abused his discretion in granting the temporary injunction. We have then to consider whether the facts stated in the bill in this case, taken as they must be as fully conceded, would entitle the plaintiffs to a decree of specific performance. No fact question arises since the motion for the interlocutory injunction was heard in connection with the motion to dismiss the bill of complaint.

■ In considering the questions arising on the pleadings, we are confronted at the outset with the proposition whether that which was left to arbitration was a vital and essential part of the contract or was a subordinate or subsidiary question and merely a detail. We are of the opinion, from the statements in plaintiffs' bill, that the matter left to be arbitrated, in the event of a disagreement between Crew, Sr., and Terrell, was a vital matter and was of the very essence of the contract. While, as alleged in the bill, the sum of $117,042.60 was fixed as the price of the stock, yet it was provided that from this price so fixed should be deducted any overvaluation of assets on the books of the bank, and the bill alleges that the investigation to be made of the assets and liabilities of the bank was in order to determine the real value of the stock. It is evident from these allegations in the bill that the price as fixed was not regarded by either party as the real price to be paid, but simply was fixed as a starting point from which the price to be paid was to be ascertained by deduction of certain amounts yet to be determined, and, in the event of disagreement between the parties, to be determined by arbitration. Such an agreement to arbitrate as is set up in the plaintiffs' bill is in effect and substance an agreement to fix the real price to be paid by arbitration. Where the price to be paid is to be fixed by arbitration, courts

will not specifically enforce the contract, for in such cases the matter referred would go to the very heart of the contract, and it is well settled that specific performance will not be decreed of a contract which cannot be enforced except through the medium of arbitrators. Milnes v. Gery, 14 Ves.Jr. 400; 25 R.C.L. 300; 68 A.L.R. 159, note; Mutual L. Ins. Co. v. Stephens, 214 N.Y. 488, 108 N.E. 856, L.R.A.1917C, 809; Red Cross Line v. Atlantic Fruit Company, 264 U.S. 109, at pages 120, 121, 44 S. Ct. 274, 276, 68 L.Ed. 582; Georke Kirch Co. v. Georke Kirch Holding Co., 118 N.J. Eq. 1, 176 A. 902; Federal Law of Contracts, vol. 1, § 219. See Electric Management & Engineering Corporation v. United Power & Light Corporation (C.C.A.) 19 F.(2d) 311; Castle Creek Water Co. v. City of Aspen (C.C.A.) 146 F. 8, 12, 8 Ann.Cas. 660.

In Pomeroy's Specific Performance (3d Ed.) § 309, that author says in discussing this point: "Wherever it is an essential part of a contract for the sale of property that its price is to be fixed by valuers, whose appointment is also therein stipulated for, a specific performance will not be decreed unless the amount has been determined according to the provision, and in such a final manner as to become a term of the contract. The parties having seen fit to rely upon the judgment of persons selected by themselves, the court has no legitimate means of making the award itself, or of directing it to be made by a master or an expert, for this would be substituting another contract in the place of the one to which the parties had assented. It makes no difference whether the parties, or one of them, fail to appoint the valuers, or whether, on being appointed, they neglect or refuse to make an award, or whether one of the parties refuses to permit his nominee to go on. If, however, the provision for a valuation is not an essential element of the agreement, but is merely collateral or incidental, or auxiliary to its main scope and purpose, the court will specifically execute the contract—if otherwise a proper one—and in so doing will, in some manner, fix upon the value. The strong tendency of the recent decisions is toward the construction of contracts so as to admit this latter rule, and to limit the operation of the doctrine as first stated." See, also sections 149, 150, and 151.

In Castle Creek Water Co. v. City of Aspen, supra, Judge Sanborn says: "But where the stipulation for the appraisers is a condition or the essence of the contract of sale, and a refusal to enforce it will leave the parties in their original situations when the agreement was made, a court of equity will not specifically enforce it."

Here the agreement to arbitrate concerns a question that is an essential part of the contract, and the plaintiffs have their remedy for any damages that may have resulted from a breach of contract, in an action at law.

In Red Cross Line v. Atlantic Fruit Company, supra, Mr. Justice Brandeis lays down the rule as follows: "The federal courts—like those of the states and of England—have, both in equity and at law, denied, in large measure, the aid of their processes to those seeking to enforce executory agreements to arbitrate disputes. They have declined to compel specific performance, Tobey v. County of Bristol, Fed. Cas.No.14,065, 3 Story, 800, 819–826."

We have failed to find any decision holding that a contract for the sale of personal property which leaves the price to be fixed by arbitration is specifically enforceable.

There is a serious question as to whether the contract as set out in the bill is not too vague and indefinite to permit of specific performance by a court of equity and whether the owner of all the common stock of a bank has any right to contract to give the prospective purchaser, of the bank stock, a right to inspect the books of the bank when the interest of holders of certain classes of preferred stock are not consulted and when the officials of the bank have not concurred in the permit to examine the books. We are of the opinion that the corporate entity of the bank cannot be ignored to this extent, especially in view of the holding of preferred stock by the Reconstruction Finance Corporation, which was in no way a party to the option contract. New Colonial Ice Co. v. Helvering, Commissioner, 292 U.S. 435, 54 S.Ct. 788, 78 L.Ed. 1348.

There are a number of other points raised, but, in view of our conclusion, above set out, that the provision for arbitration as alleged in the bill was a provision with respect to a vital part of the contract, and therefore made it such a contract as equity will not specifically enforce, it is not necessary to discuss the other questions raised.

■ The facts stated in the bill, fully conceded, do not set up a contract that a court of equity will specifically enforce and, in granting the temporary injunction, the judge below granted equitable relief where no equity existed. Meccano, Limited, v. John Wanamaker, supra. The granting of the temporary injunction was an abuse of judicial discretion.

The decree of the court below will accordingly be reversed, and the cause remanded, with direction to dismiss the bill.

Reversed.

PARKER, Circuit Judge (dissenting).

This is an appeal from an order granting an interlocutory injunction. The suit, as originally instituted, was one to obtain inspection of the affairs of a corporation, in order that plaintiffs might elect whether or not to exercise an option to purchase its capital stock; and injunction was asked in the meantime to enjoin the conveyance of the stock covered by the option. The bill of complaint was amended, however, to allege that plaintiff was ready, willing, and able to purchase the stock in accordance with the terms of the option and to ask specific performance of the contract of sale in addition to the inspection and injunctive relief originally asked. Motions to dismiss the amended bill were denied, and an interlocutory injunction was granted forbidding the sale of the stock pending trial. Defendants have appealed, contending that it was erroneous to grant injunctive relief, as the pleadings made no case for specific performance.

The plaintiffs are J. W. Crew, Sr., and J. Winfield Crew, Jr., father and son, of Roanoke Rapids, N. C. The defendant Simmons Company is a Delaware corporation having an office in the city of New York, and the defendant Roanoke Bank & Trust Company is a North Carolina banking corporation, all of whose capital stock is owned by the Simmons Company, except $60,000 of preferred A stock owned by the Reconstruction Finance Corporation. The amended bill alleges that on August 14, 1935, J. W. Crew, Jr., acting for himself and his father, went to New York at the request of the Simmons Company to negotiate with that company for the purchase of its stock in the bank; that at that time the Simmons Company gave plaintiffs an option until September 19, 1935, to purchase the stock at the price of $117,042.60, subject to deductions in the event it should be found that the real estate of the bank was carried on its books at excessive valuation or that any of its other assets were worthless; that, as a part of the contract granting the option, the Simmons Company agreed to afford plaintiffs opportunity of examining the assets of the bank for the purpose of determining the value of its stock so as to decide whether or not to exercise the option; that plaintiffs promised to make investigation of the bank's assets for this purpose, and, in accordance with their promise, were proceeding with the investigation at considerable expense to themselves in money, time, and labor, when the officers of the bank refused to furnish them with certain information requested; and that, upon plaintiff's complaining to the Simmons Company of the refusal, that company on August 28th notified plaintiff that it had decided not to comply with the option which it had given. It further alleges that plaintiffs are ready, willing, and able to purchase and pay for the stock at the option price, less such deductions as may be proper under the contract.

With respect to the right to deductions from the agreed price of $117,042.60, the allegations are that it was a part of the option contract that, if it should appear upon an examination of the assets of the bank that they were not worth the amount reflected on its books, one Terrell, managing vice president of Simmons Company, and J. W. Crew, Sr., would together value the real estate, banking houses and fixtures, and determine what part of the assets, if any, was worthless, and would deduct from the option price any difference between the actual and book values of the real estate, banking houses and fixtures and the amount which they might find to be represented by worthless assets. In the event that Crew, Sr., and Terrell could not agree on values, a third party, to be selected by them, should be called in for that purpose.[1]

---

[1] The pertinent paragraphs of the amended bill are as follows:

"7. That after negotiations with the duly authorized officers of Simmons Company, Simmons Company through said officers, gave the plaintiffs a verbal option on said stock until September 19, 1935, at the price of $117,042.60. It was stipulated as part of said agreement that J. Winfield Crew, Jr., should return to his home in Roanoke Rapids and make investigation of the assets, real and per-

The suit was instituted in a state court August 30, 1935, before the option period had expired, and the complaint, as originally filed, did not aver acceptance of the option by plaintiffs, but asked merely the enforcement of the right of inspection under the contract that they might determine whether or not to accept it, with injunction forbidding transfer of the stock in the meantime. Within a week thereafter defendant Simmons Company filed petition for removal to the federal court, and on

sonal, and the liabilities of said bank in order to determine the real value of the stock of said corporation. It was agreed between the plaintiffs and Simmons Company that during the period of the option that the Roanoke Bank & Trust Company would afford the plaintiffs every opportunity and facility for investigating the assets of said bank, including the notes and discounts and real estate, and also of ascertaining definitely the liabilities of said bank in order to determine the real value of the stock of said institution. It was further agreed between Simmons Company and the plaintiffs that if the assets of said bank should not be worth the sum of $117,-042.60 as reflected in the books of said bank, that Alfred Terrell, managing vice-president of Simmons Company, would come to Roanoke Rapids, N. C., and together with J. W. Crew, Sr., should determine the reasonable and fair market value of the real estate, banking houses and fixtures owned by said bank and if it was found to be less than it was carried on the books of said bank that there would be a diminution in price of $117,042.60 to the extent that the value of said real estate was found by the aforesaid parties to be less than it was carried on the books of said bank.

"8. That if it were found upon investigation that there were worthless assets in the form of notes or other credits of said bank, that there would likewise be pro tanto a diminution of the option price of $117,042.60.

"9. That if the said J. W. Crew, Sr., acting for the plaintiffs, and Alfred Terrell, acting for Simmons Company, could not agree upon said values that a third party to be selected by them should be called in and ascertain said values for the purposes aforesaid.

"11. That relying upon the promise of Simmons Company to comply with each and every term of said option, the plaintiffs, at request of Simmons Company, came home and at considerable expense in money, time and labor, proceeded to investigate so far as was known to them the values of the real property held by the Roanoke Bank & Trust Company.

"12. That during the negotiation for said option and as a part of said option as actually agreed upon, Simmons Company, through its duly authorized officer, agreed to and with the plaintiffs that it would make available to the plaintiffs all of the necessary information and furnish to the plaintiffs the opportunity for investigating and inspecting all of its assets in order to determine its value in relation to the option price. That after the return to Roanoke Rapids of the said J. Winfield Crew, Jr., he called upon S. T. Peace, President of the said bank, for certain definite information which Peace promised to furnish him within a few days or as soon as was convenient, which said Peace failed to furnish, and the second and third times the plaintiffs made demand upon Peace for this information they could obtain from him no promise as to the time in which it would be furnished. Thereupon the plaintiffs communicated with Simmons Company in New York both by letter and telephone, and Mr. Terrell, managing vice-president of Simmons Company, informed J. Winfield Crew, Jr., one of the plaintiffs, that he would be in Roanoke Rapids on Wednesday morning, September 28th, and would straighten the matter out.

"13. That the said Alfred Terrell came to Roanoke Rapids during the day of August 28th and after consulting with S. T. Peace, as these plaintiffs are advised and believe, came to see J. Winfield Crew, Jr., and informed him that they had decided not to comply with the option theretofore given.

"14. That said stock on which plaintiffs hold said option is of peculiar value to the plaintiffs in that its acquisition will give them absolute ownership of the Roanoke Bank & Trust Company other than the preferred stock held by the Reconstruction Finance Corporation, and a failure on the part of the Simmons Company to live up to its contractual obligations will cause the plaintiffs to suffer irreparable damage, and injury, for which a judgment in damages would be totally inadequate. That said stock has no recognized market value and cannot be obtained except from the defendant, Simmons Company.

"16. That the plaintiffs are ready, able and willing to perform said contract and to purchase and pay for said stock at the option price, less the deductions, if any, that shall be made upon the valuation of said property, said deductions to be made in accordance with the provisions of the contract."

September 18th, one day before the expiration of the option, and while plaintiffs were still denied the right of inspection to which they were entitled under it, the cause was docketed there. On September 23d motion to dismiss the complaint was filed by defendant, and other motions and amendments followed until on October 28th the amended· bill to which I have referred was filed. In that bill plaintiffs averred that they were ready, willing, and able "to perform said contract and to purchase and pay for said stock at the option price, less the deductions, if ·any, that shall be made upon the valuation of said property."

While the appeal is from the order granting interlocutory injunction, the scope of the inquiry on appeal is not confined to the exercise of the trial court's discretion; for defendants object to the injunction, not with respect to the exercise of discretion, but on the ground that the pleadings make no case for specific performance. See Arizona Edison Co. v. Southern Sierras Power Co. (C.C.A.9th) 17 F.(2d) 739, and cases there cited. They do not contend that specific performance may not be granted of a contract relating to the sale of the controlling interest in the stock in a corporation whose shares have no market value. See Mutual Oil Co. v. Hills (C.C.A.9th) 248 F. 257; Fletcher Cyclopedia of Corporations, vol. 6, p. 6610; Pomeroy's Equity Jurisprudence (4th Ed.) § 2174; 58 C.J. 1041–1043; 25 R.C.L. 299; note, 22 A.L.R. 1032. Their contentions present the following questions with respect to the validity of the contract as alleged and the right of plaintiffs to specific performance, viz.: (1) Was there a sufficient consideration to support the option contract? (2) Was there a timely acceptance of the offer contained in the option? (3) Is the contract void because of the provisions of the New York statute of frauds? (4) Should specific performance be denied for lack of mutuality either in the obligation of the contract or in the remedy available? And (5) should specific performance be denied because arbitration is provided for with respect to deductions from the purchase price?

1. The Question of Consideration.

The contention that the option contract was void for want of consideration is manifestly untenable. It is alleged, not only that it was a part of the agreement extending the option that Crew, Jr., should return to his home and make investigation of the assets and liabilities of the bank, for the purpose of determining the value of the stock, but also that, relying upon the promise of the Simmons Company, he proceeded with the investigation at considerable expense in money, time, and labor. Can it be that one who, in consideration of the granting of an option, promises to make investigation of the property with a view of purchasing it, and who incurs expense in making the investigation, is without remedy if the other party changes his mind and decides to repudiate, merely because such other party has not received something of value from him? I do not think so. While it is well settled that a mere offer made without consideration may be withdrawn at any time before acceptance, notwithstanding expense and effort which the offeree may have incurred in investigation, a different rule applies where there is an agreement to keep the offer open for a definite time and as a part of such agreement the offeree agrees to make the investigation. In such case, the option contract, which is the agreement to hold the offer open for a definite period, is supported by the promise of the offeree to investigate. When the investigation promised is actually begun, and labor or expense is incurred as a result. thereof, this is an additional consideration; for it is well settled that damage or detriment to· promisee constitutes as good a consideration for a promise as benefit to the promisor. Hendrick v. Lindsay, 93 U.S. 143, 148, 23 L.Ed. 855. See, also, Federal Law of Contracts, vol. 1, § 138, pp. 241 and 292,. where the rule applicable is thus stated at page 292: "So though an agreement for the sale of lands or chattels, consisting of an offer of the vendor or seller to sell without any obligation on the part of the purchaser or buyer to buy or vice versa,. is a nudum pactum unless there is some consideration for the offer, and the offer may be withdrawn at any time before it has been accepted by the buyer or seller,. it is otherwise if the agreement, express. or implied, of the offeror not to withdraw the offer is based on a consideration. And it is held that a promise contained in the contract and made by the optionee to give· substantial time and effort in investigating any question, like the value of the property, which he must consider, before he decides whether or not to exercise the option, is a sufficient consideration for the·

promise to sell if the optionee decides to buy."

In Hunt v. Stimson (C.C.A.6th) 23 F. (2d) 447, 450, Judge Denison thus states the rule: "A promise contained in the contract and made by the optionee to give substantial time and effort to investigating any question, like the value of the property, which he must consider before he decides whether or not to exercise the option, is a sufficient consideration for the promise to sell or buy if the optionee thereafter decides to buy or sell."

Prof. Williston in his work on Contracts, vol. 1, § 61, p. 109, says that "a promise to keep an offer open in consideration of an agreement to examine the land, which is the subject matter of the offer, and to investigate the title, is sufficiently supported." And one of the authorities which he cites in support of the statement is Weaver v. Burr, 31 W.Va. 736, 8 S.E. 743, 753, 3 L.R.A. 94, where will be found an exhaustive and able discussion of the subject by Judge Woods, from which the following is quoted: "To the question propounded by Mr. Wharton, 'Can a proposer bind himself to keep open a proposal until a specified date, so that an acceptance any time within that date be good?' we answer: Yes; there is no doubt of it, provided only that there is a sufficient consideration for the promise to keep it open, flowing from the party to whom the promise is made. To constitute such a consideration, it is not necessary that a benefit should accrue to the person making the promise. It is sufficient if something flows from the person to whom it is made, and that the promise is the inducement to the transaction. It may consist of some benefit to the promisor; or some loss, injury, or inconvenience to the promisee; or of some money or other thing of value given, exchanged, or paid; or of some promise or undertaking of the promisee to pay, give, or exchange such thing of value; or to incur some trouble or expense; or to do, or to not do, some lawful act; or to surrender, abandon, or suspend the exercise of some legal right,—in consideration of which acts and promises on the part of the promisee the proposer promised that his offer should be left open for a specified time. In all these cases the party to whom the proposal was made and the proposer have entered into a valid contract, founded on their mutual promises, which are a sufficient consideration, whereby the proposer has bound himself to leave his offer open until the time limited has expired."

## 2. The Question of Acceptance.

It is elementary that to convert an option into a binding contract the offer must be accepted within the time limited. 55 C. J. 111; 25 R.C.L. 237. But, where the option contract binds the offeror to afford to the offeree an opportunity to inspect the property, and delay in acceptance is due to the wrong of the offeror in refusing to permit inspection, I do not think that the offeror should be permitted by a court of equity to rely on such delay in extinguishment of his obligation, provided the offeree has moved promptly for the protection of his rights. It will not do to say that the offeree may sue for damages for breach of the contract to permit inspection in such case; for, certainly, if an award of damages would not be an adequate remedy for breach of the contract of sale, it would not be adequate for breach of the contract to permit an inspection for the purpose of determining whether or not there should be a sale. If, therefore, equity may enforce specifically the contract to sell, I see no reason why it may not enforce the contract to permit inspection; and, if it may do this, it may as an incident of such relief extend the time for acceptance under the option, as otherwise relief would be nugatory. See article by Dean Van Hecke in 12 Minnesota Law Review, p. 1. As has been well said, "The arm of equity is not palsied or shortened"; and it would be but a mockery of justice to hold that the offeree is entitled to the examination which has been wrongfully denied him, but may not have any real relief, even though he may decide to purchase after such examination, merely because the offeror, by his wrongful refusal of the examination, has delayed the possibility of acceptance until after the expiration of the time limited in the option.

It is argued that equity will not specifically enforce a provision for inspection, on the theory that it is merely a preliminary and incidental provision of a contract which would amount to nothing if the offeree should decide not to purchase; reliance being placed particularly upon Electric Management & Engineering Corporation v. United P. & L. Corporation (C. C.A.8th) 19 F.(2d) 311 and Mutual Life Ins. Co. v. Stephens, 214 N.Y. 488, 108 N. E. 856, L.R.A.1917C, 809. The case at bar is different from these cases, however, in

that here there is allegation of willingness to perform on the part of the offeree; and this will enable the court to enforce the entire contract and not merely the inspection provision. But apart from this, I think that the court has power to enforce specific performance of an agreement of an option contract to permit inspection, provided the subject matter of the contract is such as to justify specific performance in case of acceptance. As said by Dean Van Hecke in the article to which I have referred: "It is a mere circumstance that there have been relatively few reported cases where the optionee has found it advisable or necessary, in advance of his own acceptance of the offer, either to prevent the optionor from selling the property involved or from violating any duty to furnish the information upon the basis of which the election was to be made. But this fact should not, while the prescribed period is still, unexpired, prevent the occasional needy one from having the direct aid of a court of equity to assure the forthcoming of that information and the continued availability of the property. The seller has been as fully paid in this case as in that where the seller merely tries to withdraw; his obligations are just as fixed, and the optionee's need for the continuance of his privileges is just as real. In a word, the same commercial necessity exists here as a reason for the direct intervention of a court of equity that serves as a basis for the irrevocability of the offer. A properly framed decree will protect the optionor by releasing the property upon the lapse of a period equal to that originally set by the contract if an acceptance has not been made, and by so controlling the production of information or the inspection as to work the least hardship possible, especially where the optionee is to stand the expense thereof."

A case directly in point is Mayor and Council of Town of Boonton v. United Water Supply Co., 83 N.J.Eq. 536, 91 A. 814, 815, affirmed 84 N.J.Eq. 197, 93 A. 1086. That case involved the enforcement of an inspection privilege accorded the plaintiff by a contract which gave an option to purchase a water system. The court entered an order awarding the inspection, saying: "From my examination of the case I have reached the conclusion that the relief prayed for by the complainant should be granted. There is no doubt in my mind that, read in connection with the other provisions of the contract, the words 'at any and all times,' which appears in paragraph 11, means that the water company bound itself to give the inspection, even if the town did not exercise its option to purchase. The privilege, it appears, was incorporated in the contract to give Boonton a chance to know the true conditions before it should agree to exercise its option. This is frequently done where the public is concerned and is to be the purchaser. And it is no doubt true that without such right it would be difficult to get the people at large to sanction the making of a contract such as the one under consideration. There is, of course, consideration for the agreement to give this inspection as the town has been using the water supplied by the water company and paying for the same under the agreement, ever since it was executed." See, also, Kann v. Wausaw ,Abrasives Co., 81 N.H. 535, 129 A. 374, and Johnston v. Frederick Stearns & Co., 160 Mich. 247, 125 N.W. 29.

And I do not think that the fact that the contract for inspection was not made by the bank is, under the circumstances alleged, a sufficient reason of itself for denying the inspection prayed. It is elementary, of course, that the contract of a stockholder does not bind the corporation; but, on the other hand, where the stockholder owns all of its stock,[2] he should not be permitted to evade the obligation of a valid contract into which he has entered by pleading that performance depends, not upon him, but upon the corporation. Every one knows that such a stockholder is in position to control the affairs of the corporation through control of its board of directors; and, where he contracts to permit an inspection of its affairs by one to whom an option to purchase its stock has been given, it is idle to say that the contract cannot be performed because the officers and directors of the corporation will not consent that the inspection be made. If the court is satisfied, as ordinarily it will be in such case, that such officers and directors are acting in the matter as agents of the stockholder, it can and should di-

---

[2] The Simmons Company owns all the stock of the bank except certain preferred stock owned by the Reconstruction Finance Corporation, which presumably has no interest in refusing an inspection.

rect them to comply with his contract or at least enjoin them from interfering with the inspection which he has contracted to give.

It is well settled that equity can and should look through the corporate fiction to the realities of a situation where necessary to prevent fraud or injustice; and while, as a general rule, a corporation and its stockholders are deemed separate entities, the rule is subject to the qualification "that the separate identity may be disregarded in exceptional situations where it otherwise would present an obstacle to the due protection or enforcement of public or private rights." New Colonial Ice Co. v. Helvering, Com'r, 292 U.S. 435, 442, 54 S.Ct. 788, 791, 78 L.Ed. 1348. See, also, 7 R.C.L. 27; Fletcher Cyclopedia of Corporations, vol. 1, p. 57; Linn & Lane Timber Co. v. United States, 236 U.S. 574, 577, 35 S.Ct. 440, 59 L.Ed. 725; United States v. Milwaukee Refrigerator Transit Co. (C. C.) 142 F. 247, 255. No clearer case for the application of this salutary rule could well be imagined than is here presented where one who is in effect the sole stockholder of a corporation is invoking the corporate fiction as an excuse for not performing a contract as to a matter over which he presumably has full control.

I do not, of course, mean to say that an offeree may have an inspection of the affairs of a corporation in every case where the contract of a stockholder so provides, or even that he is entitled to such inspection as a matter of right upon a contract by a holder of a majority of the stock or all of it; for situations can readily be imagined in which the court would refuse the inspection for the protection of the rights of others who might have an interest in the affairs of the corporation. What I do mean to say is that, where there is nothing to show that the rights of other persons will be injuriously affected by such examination, the holder of all of the stock of a corporation who has contracted to permit such examination in connection with an option to sell the stock may not evade his contract by hiding behind the corporate fiction. In ordinary cases, it would be nothing short of a fraud on the rights of the optionee for the optionor to escape the obligations of his contract under such a pretext.

Looking to the face of the amended bill, therefore, I cannot say that there has not been a timely acceptance of the offer contained in the option. Plaintiffs were proceeding with the inspection in accordance with the terms of the option contract when they were halted by the refusal of the bank to permit the inspection. After applying to the Simmons Company, with no other result than to elicit that company's repudiation of the entire contract, they instituted suit to obtain the inspection; but, as a result of the tactics of the defendants, the granting of the inspection asked has been delayed beyond the option period. Under such circumstances, I think that it was within the power of the court to grant the inspection and extend the period for accepting the option until plaintiffs could obtain the information to which they were entitled. By the amended bill, however, plaintiffs without waiting for the information have accepted the offer of the option; and, in the absence of anything to show that they were not entitled to the inspection prayed, this was certainly within time.

### 3. The Statute of Frauds.

The contention is made that specific performance of the contract may not be awarded because it is said that it is invalid under the New York statute relating to sales of goods (Personal Property Law, § 85, subd. 1, as added by Laws 1911, c. 571 [40 McKinney's Consol.Laws of N.Y. c. 41]), which provides: "1. A contract to sell or a sale of any goods or choses in action of the value of fifty dollars or upwards shall not be enforceable by action unless the buyer shall accept part of the goods or choses in action so contracted to be sold or sold, and actually receive the same, or give something in earnest to bind the contract, or in part payment, or unless some note or memorandum in writing of the contract or sale be signed by the party to be charged or his agent in that behalf."

It is argued that this statute goes to the substantive validity of a contract made in New York and not merely to the remedy provided for its enforcement; and that, as the contract sued on was invalid for that reason in New York where it was made, it is invalid everywhere. It is well settled that as to matters affecting the formal validity of contracts the lex loci celebrationis governs (Scudder v. Union Nat. Bank, 91 U.S. 406, 23 L.Ed. 245); and, if we were of opinion that the statute relied on should be interpreted as affecting the validity of contracts made in New

York, it would be our duty to apply it here and hold the contract to be invalid because of its provisions. There is no decision of the Court of Appeals of New York, however, holding that the statute is entitled to such an interpretation; and, in the absence of such a holding, by which of course we would be bound, I am clearly of the opinion that the statute is one affecting the remedy obtainable in the courts of New York and not the validity of contracts made there. It does not forbid the making of a contract otherwise than according to the methods pointed out, nor does it provide that contracts not so made shall be void and of no effect, or even voidable. It provides merely that, in the absence of memorandum in writing or showing of part performance, contracts embraced by the statute "shall not be enforceable by action." It does nothing except deny remedy in the courts on contracts which do not comply with the statutory requirements; and it is too well settled to require citation of authority that with respect to matters affecting the remedy, the lex fori, and not the lex loci contractus governs.

I have carefully considered the learned article by Professor Lorenzen,[3] to which attention is called, criticizing the doctrine of Leroux v. Brown, 12 C.B. 801, and arguing that, notwithstanding the differing language used in the provisions of the various statutes of frauds, they affect substantive rights of the parties and should be held to be controlled by the law governing the formalities of contracts in general; i. e. by the lex celebrationis as distinguished from the lex fori. It will be noted, however, that Professor Lorenzen would apply the doctrine for which he contends only to the extent of upholding contracts which comply with the law of the place of contract, and which do not comply with the law of the forum. With respect to the converse proposition he says: "The peculiar nature of the statute of frauds makes it desirable, at least as a matter of legislative policy, that contracts not enforceable under the statute of frauds of the state whose law determines the formalities of contracts in general shall be enforced nevertheless if they meet the requirements of the statute of the forum." I think, however, that the rule is more correctly stated by Professor Beale, Conflict of Laws, vol. 3, p. 1618, as follows:

"The statute of frauds of any state may be a provision that 'no action may be brought' on certain contracts, or that contracts not in writing shall be 'void'. The natural interpretation of a statute of the first type would be, that it goes to procedure, and applies to any contract, wherever made, attempted to be sued on at the forum; while contracts of the second class go to the substance, and apply to all contracts made in the state, and to no others." See, also, American Law Institute Restatement of Conflict of Laws, § 334(b).

It is, of course, within the power of the state to require that contracts be executed with due formality and to make the observance of such formality essential to their validity. But the evil at which the statute of frauds is directed is, not fraud in the making of contracts, but fraud and perjury in proving them; and, as the object of the statute is attained by denying remedy on mere verbal contracts, it should not be construed as going to the validity of the contract unless the language used imperatively requires such construction. That such a statute is not ordinarily construed as going to the validity of the contract is shown by the fact that the decisions of most courts support the following propositions: (1) The note or memorandum need not be executed at the time, but may be executed at any time before suit; (2) it need not be made by the parties as the expression of their agreement (a letter to a third person or even a letter repudiating the agreement may be sufficient); and (3) an oral agreement will be enforced by the courts unless the statute is relied on as a defense. See Lorenzen, 12 Yale Law Journal at 321. And it seems to me that, if the statute does not go to the validity of the contract, as Professor Lorenzen admits, there is no point in the argument that it affects substantive rights. The right to enforce a contract by suit in court, even though a substantive right, is one inseparably connected with procedure, which the law which establishes the court must govern. And certainly the better reason would seem to dictate that a statute enacted by a state to prevent frauds and perjuries in court should be construed as intended to apply to proceedings in the courts of that state and not in the courts of some other state over which its Legislature has no jurisdiction.

---

[3] 32 Yale Law Journal, p. 311.

Leroux v. Brown, supra, 12 C.B. 801, decided in 1852, is the leading case on the subject. That was a suit in an English court upon an oral agreement made and to be performed in France (and valid there), which came within the terms of section 4 of the English statute of frauds, the language of which is: "No action shall be brought upon any agreement" etc. The question as to whether the statute was one going to the validity of contracts or one affecting the remedy in the courts was fully considered; and the judges were unanimously of the opinion that the latter was the correct interpretation. Chief Justice Jervis said: "The statute, in this part of it, does not say, that, unless those requisites are complied with, the contract shall be void, but merely that no action shall be brought upon it; and, as was put with great force by Mr. Honyman, the alternative, 'unless the agreement, or some memorandum or note thereof, shall be in writing',—words which are satisfied if there be any written evidence of a previous agreement,—shows that the statute contemplated that the agreement may be good, though not capable of being enforced if not evidenced by writing. This therefore may be a very good agreement, though, for want of a compliance with the requisites of the statute, not enforceable in an English court of justice. This view seems to be supported by the authorities; because, unless we are to infer that the courts thought the agreement itself good, though not made in strict compliance with the statute, they could not consistently have held, as was held in the cases referred to by Sir Edward Sudgen, that a writing subsequent to the contract, and addressed to a third person, was sufficient evidence of an agreement, within the statute. It seems, therefore, that both authority and practice are consistent with the words of the 4th section. The cases of Carrington v. Roots, and Reade v. Lamb, however, have been pressed upon us as being inconsistent with this view. It is sufficient to say that the attention of the learned judges by whom those cases were decided, was not invited to the particular point now in question. What they were considering was, whether, for the purposes of those actions, there was any substantial difference between the 4th and 17th sections. It must be borne in mind that the meaning of those sections has been the subject of discussion on other occasions. In Crosby v. Wadsworth, 6 East, 602, Lord Ellenborough, speaking of the 4th section, says,—'The statute does not expressly and immediately vacate such contracts, if made by parol; it only precludes the bringing of actions to enforce them.' Again, in Laythoarp v. Bryant, 2 N.C. 735, 3 Scott, 238, Tindal, C. J., and Bosanquet, J., say distinctly that the contract is good, and that the statute merely takes away the remedy, where there is no memorandum or note in writing. I therefore think we are correct in holding that the contract in this case is incapable of being enforced by an action in this country, because the 4th section of the 29 Car. 2, c. 3, relates only to the procedure, and not to the right and validity of the contract itself."

Maule, J., said: "Now, this is an action brought upon a contract which was not to be performed within the space of one year from the making thereof, and there is no memorandum or note thereof in writing signed by the defendant or any lawfully authorized agent. The case, therefore, plainly falls within the distinct words of the statute. It is said that the 4th section is not applicable to this case, because the contract was made in France. This particular section does not in terms say that no such contract as before stated shall be of any force; it says, *no action shall be brought upon it.* In their literal sense, these words mean that no action shall be brought upon such an agreement in any court in which the British legislature has power to direct what shall and what shall not be done; in terms, therefore, it applies to something which is to take place where the law of England prevails."

The decision in Leroux v. Brown was followed in this country seventeen years later by Downer v. Chesebrough, 36 Conn. 39, 4 Am.Rep. 29, which sustained the admissibility of parol evidence to prove that an indorsement in blank on a promissory note was made for purposes of collection, although the indorsement was made in New York, and by the law of that state parol evidence was not admissible for such purpose. Both Leroux v. Brown and Downer v. Chesebrough were cited with approval by the Supreme Court of the United States in Pritchard v. Norton, 106 U.S. 124, 134, 1 S.Ct. 102, 110, 27 L. Ed. 104, wherein it was pointed out that under the decision of Scudder v. Union Nat. Bank, supra, 91 U.S. 406, 23 L.Ed. 245, "the form of the contract is regulated by the law of the place of its celebra-

tion, and the evidence of it by that of the forum."

While it is true that Leroux v. Brown has been criticized, this criticism, as said in Heaton v. Eldridge, 56 Ohio St. 87, 46 N.E. 638, 36 L.R.A. 817, 60 Am.St.Rep. 737, has been directed in large part at the distinction drawn between the fourth and seventeenth sections of the statute, most cases which criticize the distinction holding that the seventeenth section as well as the fourth relates to the remedy. Mr. Justice Story's opposing views were before the English court and were fully considered in Leroux v. Brown; and Judge Redfield, the learned editor of Mr. Justice Story's "Conflict of Laws," is quite convinced by the reasoning of that case. He says: "We must confess that upon principle, as the statute does not declare the contracts void, but only that no action or suit, either in law or in equity, shall be maintained on such contract, it ought to be regarded as a statute affecting the remedy, rather than the contract, and that, wherever made, it could not be sued in the courts of a state where the statute expressly provided that no such action shall be maintained."

While there is some conflict in the decisions, I think that the weight of authority in this country, as well as the reason of the matter, support the rule of Leroux v. Brown to the effect that a statute which forbids the bringing of an action to enforce a contract, unless same is in writing, is a statute affecting the remedy and not one affecting the validity of the contract; and that in applying such a statute the court will look to the lex fori and not to the lex loci contractus. See, in addition to the authorities previously cited, Hogue-Kellogg Co. v. G. L. Webster Canning Co. (C.C.A.4th) 22 F.(2d) 384, 386; Hotel Woodward Co. v. Ford Motor Co. (C.C.A. 2d) 258 F. 322; C. W. Rantoul Co. v. Claremont Paper Co. (C.C.A.1st) 196 F. 305; Buhl v. Stephens (C.C.) 84 F. 922; Third Nat. Bank of New York v. Steel, 129 Mich. 434, 88 N.W. 1050, 64 L.R.A. 119, and note; Heaton v. Eldridge, 56 Ohio St. 87, 46 N.E. 638, 36 L.R.A. 817, 60 Am.St.Rep. 737; Obear v. First Nat. Bank, 97 Ga. 587, 25 S.E. 335, 33 L.R.A. 384; Boone v. Coe, 153 Ky. 233, 154 S.W. 900, 51 L.R.A.(N.S.) 907, and note; Bird v. Monroe, 66 Me. 337, 22 Am.Rep. 571; 27 C.J. 125; 25 R.C.L. 696; Minor on Conflict of Laws, 414.

Straesser-Arnold Co. v. Franklin Sugar Refining Co. (C.C.A.7th) 8 F.(2d) 601, 604, which dealt with a statute using the exact language of the statute before us, is directly in point; and the language of Judge Anderson, delivering the opinion of the court, leaves little to be said on the question. After adverting to the difference in the language used in the fourth and seventeenth sections of the English statute of frauds, he says: "Section 4 has been held to apply to the remedy or the enforcement of the contract, while in some cases section 17 has been held to go to the validity of the contract. But this distinction has not met with general approval, some cases holding that the statute of frauds as a whole relates to the remedy, and that the statute in force in the jurisdiction where the action is brought governs in all cases. The language of the provision here under consideration 'shall not be enforceable by action' would seem to leave little room for discussion upon this question. Judge Baker, in the Circuit Court of Indiana in Buhl v. Stephens, 84 F. 922, had this precise question before him and after reviewing the authorities concluded that 'whatever relates to the remedy, and constitutes a part of the procedure, is determined by the law of the forum; but whatever goes to the substance of the obligation, and affects the rights of the parties growing out of the contract itself, or inhering in it, is governed by the lex loci contractus,' and applied the statute of frauds of Indiana in a suit upon a contract made and to be performed in Pennsylvania. In so ruling he said: 'The language of the statute clearly imports that the agreement precedes the written memorandum, and may exist as a complete and valid agreement, independent of the writing. The memorandum is merely the evidence by means of which the agreement is to be established. * * * The statute relates simply to the nature or quality of the evidence necessary to establish the agreement, and does not touch the obligation or validity of the agreement when admitted or properly proved.' "

### 4. The Question of Mutuality.

I pass, as not requiring any extended discussion, the contention that the contract providing for the option to plaintiffs to purchase the stock was lacking in mutuality of obligation. The rule is well settled that, where the consideration for a promise is a promise, one will not be enforced

unless the other is binding, as otherwise it is without consideration; but, in the case of an option contract, the promise to hold open the offer must be supported by a consideration independent of the promise made in accepting it. If it is supported by such consideration, it must be upheld, notwithstanding the offeree is not bound to accept. If he does accept, there is created a mutually binding contract of bargain and sale; but this is a different contract from the option contract, which is the contract to hold the offer open, and is enforceable as such if based upon a consideration.

And I think that the contention that there was lack of mutuality of remedy is also without merit. As was well said by Mr. Justice Cardozo, discussing this question in Epstein v. Gluckin, 233 N.Y. 490, 135 N.E. 861, 862: "If there ever was a rule that mutuality of remedy existing, not merely at the time of the decree, but at the time of the formation of the contract, is a condition of equitable relief, it has been so qualified by exceptions that, viewed as a precept of general validity, it has ceased to be a rule today. Catholic F. M. Society v. Oussani, supra [215 N.Y. 1, 109 N.E. 80, Ann.Cas.1917A, 479]; Trustees of Hamilton College v. Roberts, 223 N.Y. 56, 119 N.E. 97; Haffey v. Lynch, 143 N.Y. 241, 248, 38 N.E. 298; Waddle v. Cabana, 220 N.Y. 18, 26, 114 N.E. 1054; Bostwick v. Beach, 103 N.Y. 414, 422, 9 N.E. 41; Heald v. Marden, Orth & Hastings Co., 233 N.Y. 575, 135 N.E. 924, decided April 18, 1922; Peterson v. Chase, 115 Wis. 239, 91 N.W. 687; Stone, The Mutuality Rule in New York, 16 Columbia Law Review, 443; 3 Williston, Contracts, §§ 1433, 1436, 1440, and cases there cited. What equity exacts to-day as a condition of relief is the assurance that the decree, if rendered, will operate without injustice or oppression either to plaintiff or to defendant. Williston, supra; Stone, supra; Ames, Lectures on Legal History, p. 370; Lewis, Want of Mutuality in Specific Performance, 40 Am.Law Reg.(N.S.) 270, 382, 447, 507, 559; 42 Am.Law Reg.(N.S.) 591. Mutuality of remedy is important in so far only as its presence is essential to the attainment of that end. The formula had its origin in an attempt to fit the equitable remedy to the needs of equal justice. We may not suffer it to petrify at the cost of its animating principle."

In the article in the Columbia Law Review referred to by Mr. Justice Cardozo, Mr. Justice Stone, then Dean of the Columbia Law School, went to the heart of the question in the concluding paragraph, which is as follows: "As was said by Mr. Justice Romer, 'There is a great principle which I think ought to be adhered to by this court and by every court where it can possibly do so; that is to say that a man shall abide by his contracts and that a man's contracts should be enforced as against him.' This should be the cardinal principle of equity in exercising its jurisdiction over contracts wherever legal damages afford an inadequate remedy. The doctrine that the remedies must be mutual is one invested by the courts of equity to prevent the injustice which in many cases would result if the court should give specific performance against a defendant without at the same time insuring to the defendant the performance of the plaintiff's contract. To allow the defence upon any other ground, if the contract be fair and reasonable in its provisions, is to do an injustice to the plaintiff and to violate the principle of first importance that a man's contract should be enforced against him." See, also, Town of Boonton v. United Water Supply Co., supra; Kann v. Wausaw Abrasives Co., supra; Henry L. Doherty & Co. v. Rice (C.C.) 186 F. 204; Madison Athletic Ass'n v. Brittin, 60 N.J.Eq. 160, 46 A. 652; Philadelphia Ball Club v. Lajoie, 202 Pa. 210, 51 A. 973, 58 L.R.A. 227, 90 Am.St.Rep. 627; Smith v. Bangham, 156 Cal. 359, 104 P. 689, 690, 28 L.R.A.(N.S.) 522; 3 Williston, Contracts, §§ 1433–1441; American Law Institute Restatement of Contracts, vol. 2, § 372, and comment.

The matter is well put by the American Law Institute, in the comment to the cited section, in the following language: "The law does not provide or require that the two parties to a contract shall have identical remedies in case of breach. A plaintiff will not be refused specific performance merely because the contract is such that the defendant could not have obtained such a decree, had the plaintiff refused to perform prior to the present suit. It is enough that he has not refused and that the court is satisfied that the defendant is not going to be wrongfully denied the agreed exchange for his performance. The substantial purpose of all attempted rules requiring mutuality of remedy is to make sure that the defendant will not be compelled to perform specifically without good security that he will receive specifically the agreed equivalent

in exchange. Sufficient security often exists where there is no mutuality of remedy; and there are cases in which mutuality of remedy would not in itself be adequate."

### 5. The Question as to Arbitration.

It will be noticed that in the contract, as alleged, arbitration is provided for, not to determine the purchase price to be paid for the property, but to determine the deductions to be allowed from the purchase price if the assets are found to be of a value less than shown on the books of the bank and the parties designated by the contract are unable to agree as to their real value. If the price to be paid for the stock were the matter to be referred to arbitration, the court would not attempt to enforce specific performance; for in such case the matter referred would go to the very heart of the contract, and the rule is well settled that specific performance will not be decreed of a contract which cannot be made out except through the medium of arbitrators. Milnes v. Gery, 14 Ves.Jr. 400. But, where the price is fixed by the contract and the only matter to be referred is a deduction dependent upon the valuation of assets, there is no reason why the contract should not be enforced by the court; for, if the arbitration fails, the court itself can determine the valuation and make the deduction. In such case, the matter referred to arbitration is subsidiary or incidental to the main contract, and the latter should not be permitted to fail because of it. See Cogswell v. Cogswell, 70 Wash. 178, 126 P. 431, 432; Black v. Rogers, 75 Mo. 441; Richardson v. Smith, L. R. 5 Ch. 648; Coles v. Peck, 96 Ind. 333, 49 Am.Rep. 161.

It is well settled that, where the contract has been partly performed and the parties may not be left or placed in statu quo by a refusal to enforce the contract, equity will decree specific performance notwithstanding an agreement that the price is to be fixed by arbitration. Castle Creek Water Co. v. City of Aspen (C.C.A.8th) 146 F. 8, 11, 12, 8 Ann.Cas. 660. But it is not alone with respect to cases of part performance that the rule applies. As pointed out by Judge Sanborn in the case last cited, even contracts of sale providing for the fixing of the sale price by valuers to be selected by the parties will be enforced if what is contemplated is "sale for a fair price, or for the reasonable value of the property, on the ground that that is certain which can be made certain, and that the court may itself ascertain the fair price or the reasonable value." As said by the Supreme Court of Indiana in Coles v. Peck, supra, where the provision for arbitration is inserted, as is clearly the case here, merely as a means of determining the fair value of the property, it is to be treated as nonessential, and not as preventing the enforcement of the contract and the determination of value by the court. Professor Pomeroy in his work on Specific Performance, § 151, thus distinguishes such cases from those in which the doctrine of Milnes v. Gery, supra, is applicable: "If the means specified for fixing upon the price fail for any reason, the court does not treat the contract as fatally defective; but will, in the suit for a specific performance, direct a fair and reasonable price to be ascertained in some manner preliminary to the decree, either by referring the matter to a master or other officer, or by appointing a skilled person as a special valuer, or even by determining the amount itself; it will pursue any such mode as the circumstances of the case show to be expedient. The tendency of the later English decisions is to consider these stipulations for a determination of the price by third persons, rather as matters of form than of substance; to construe them in such manner that they become incidental only to the main object of the agreement. * * * The result is that while the doctrine of Milnes v. Gery and of the class of cases to which it belongs has not been repudiated and is even now enforced, yet it is carefully restricted to the kind of contracts already mentioned; the court will treat the contract as falling within the second class, unless it would thereby do violence to the language and thwart the plain intent of the parties."

In Cogswell v. Cogswell, supra, the rule is thus stated: "The rule is well established that, where the contract has been partly performed and is no longer wholly executory, or where the provision for arbitration relates only to a mere incident, such as the arriving at the price of property or the determination of its rental value, the death or failure of the arbitrators to act gives neither party to the contract the right to rescind. In such a case the courts will enforce the contract, and will, on evidence, fix the value of the land or determine the rental."

The question was before this court in Dickinson v. Robinson (C.C.A.4th) 272 F. 77, at page 79, a case involving the renewal of a lease at a rental to be fixed by arbitration, in which this court, speaking through the late Judge Woods, said: "We are unable to discern any principle of law on which the validity of such a contract can be questioned. It may be true that the courts of equity will not specifically enforce an agreement to arbitrate. But the right of either party to demand performance of the contract to arbitrate, and his right to have the court of equity determine that which the other party refuses to have decided by arbitration as agreed, is too firmly established in reason and authority to be questioned. In such a case the substance of the contract is considered to be the sale or lease, and the method of determining the price a mere matter of form which the courts will not allow to destroy the substance. Town of Bristol v. Bristol, etc., Water Works, 19 R.I. 413, 34 A. 359, 32 L.R.A. 740; Domestic Tel. Co. v. Metropolitan Telephone Co., 41 N.J.Eq. 241, 3 A. 709; Slade v. City of Lexington, 141 Ky. 214, 132 S. W. 404, 32 L.R.A.(N.S.) 201; Joy v. St. Louis, 138 U.S. 1, 11 S.Ct. 243, 34 L.Ed. 843; Kaufmann v. Liggett, 209 Pa. 87, 58 A. 129, 67 L.R.A. 353, 103 Am.St.Rep. 988; Gunton v. Carroll, 101 U.S. 426, 25 L.Ed. 985." See, also, Wichita Water Co. v. City of Wichita (C.C.A.8th) 280 F. 770, 778; Union Pac. R. Co. v. Chicago, etc., R. Co., 163 U.S. 564, 16 S.Ct. 1173, 41 L. Ed. 265; Id. (C.C.A.) 51 F. 309, 330; City of Fayetteville v. Fayetteville Water, L. & P. Co. (C.C.) 135 F. 400; Cooke v. Miller, 25 R.I. 92, 54 A. 927, 1 Ann.Cas. 30, and note; Conner v. Drake, 1 Ohio St. 166; Parsons v. Ambos, 121 Ga. 98, 48 S.E. 696; Jones v. Brown, 171 Mass. 318, 50 N.E. 648; Grosvenor v. Flint, 20 R.I. 21, 37 A. 304; Woonsocket Mach. & Press Co. v. Miller, 18 R.I. 657, 29 A. 838; Schneider v. Hildenbrand, 14 Tex. Civ.App. 34, 36 S.W. 784, 786; 5 Pomeroy's Equity Jurisprudence, § 2180, and note; 58 C.J. 1045-6; 25 R.C.L. 300; note, 47 L.R.A.(N.S.) 369.

In the case at bar, not only does it appear that the agreement to arbitrate relates to a matter subsidiary to the main provisions of the contract, but also that it relates to a mere matter of valuation and should be construed, not as a condition of the contract, but as a means for determining fair value if the parties should be unable to agree upon it. Under the authorities cited, and upon the clear reason of the matter, I do not think that the court should find in it a stumbling block to specific performance and thus permit the Simmons Company to evade the obligation of its contract because of agreement to arbitrate a controversy, which may never arise, with respect to a matter of value which the court can determine as well as an arbitrator. To do so, it seems to me, is to force the rule that specific performance will not be decreed of a contract depending upon an agreement to arbitrate to an extent not warranted by the reason underlying the rule, and to provide, not a loophole merely, but a gateway by which vendors in a large class of cases may escape the performance of their contracts.

At a hearing on the merits, facts might be developed which would render it improper to award specific performance of the alleged contract. I cannot say, however, that no case for such relief is made by the allegations of the bill. In the language of Mr. Justice Romer quoted by Mr. Justice Stone in the article to which I have referred: "There is a great principle which * * * ought to be adhered to by this court and by every court where it can possibly do so; that is to say that a man shall abide by his contracts and that a man's contracts should be enforced as against him."