## TEXAS CO. v. Z. & M. INDEPENDENT OIL CO., Inc.

District Court, N. D. New York.

July 31, 1945.

Brown, Hubbard, Felt, Ryan & Fuller, of New York City (Gay H. Brown, of Utica, N. Y., John T. Ryan, of New York City, S. A. L. Morgan, of Amarillo, Tex., and A. H. Colcord, of New York City, of counsel), for plaintiff.

Milbank, Tweed & Hope, of New York City (John A. Kelly, of New York City, Edward C. Rowe, of Hamilton, N. Y., and L. Reyner Samet, of New York City, of counsel), for defendant.

BRENNAN, District Judge.

The plaintiff, as its principal relief in this action, seeks to obtain a judgment decreeing the specific performance of an agreement dated September 20, 1929, or, in the alternative, a declaratory judgment defining the legal rights and relationship of the parties.

The jurisdiction of this Court is founded upon diversity of citizenship and no question is raised as to the power of the Court to pass upon the issues involved.

The evidence consisting of oral testimony of witnesses taken before the Court, depositions of witnesses taken before trial, and exhibits offered in evidence is quite voluminous. The questions of fact insofar as they relate to the primary action as distinguished from the counterclaim are not seriously in dispute, and may be summarized as follows.

The Texas Company, hereafter referred to as "Texas," is a large and widely known producer and distributor of petroleum products.

The defendant, the Z. & M. Independent Oil Company, Inc., hereinafter referred to as "Z & M.," is a New York Corporation, having its principal place of business at Norwich, New York, and is a large independent distributor of petroleum products in central New York. It was principally engaged in the sale and distribution of products intended for use in motor vehicles, and consisting for the most part of gasoline and greases. It also sold and distributed kerosene and fuel. Its outlet for the products above mentioned was through its own service stations and stations independently owned where its products were offered for sale to the public. In addition, it had some large direct consumer accounts.

The Z & M. was incorporated in 1917, and it has handled the petroleum products of Texas since that date. Frank Zuber has been president and a director of the Z. & M. since its incorporation. Since 1022, when Frank Zuber purchased the stock interest of Mr. Millspaugh, until December 24, 1941, he at all times has been the owner of more than two-thirds of the outstanding stock of the Z. & M. Company. The balance of stock during that period was held by Clara L. Zuber, wife of Frank Zuber, Mable Zuber Higly, his daughter, Joseph and Mary Zuber, his brother and sister-in-law, Sterling F. Higly, his son-in-law, Frank Zuber Higly and Sterling F. Higly, Jr. his grandchildren, and a comparatively small number of shares were held by Mary H. Laden (Doyle) his secretary. In 1935, 10 shares of stock was given by Frank Zuber to his friend, Mr. Fox. On December 24, 1941, Zuber gave 800 shares of his stock to his wife, and a similar number to his daughter.

Frank Zuber acted as "general manager" and all business matters referred to in this action were negotiated and transacted by him. The complete business control by Frank Zuber over the affairs of the Z. & M. were acquiesced in by his wife and daughter, as shown by their testimony and his brother and sister-in-law, Joseph and Mary Zuber, invariably gave their proxies to him authorizing him to cast their votes at every annual and special meeting of stockholders. The remaining stockholders evidenced no interest in the business affairs of the Z. & M. On April 26, 1944, all of the outstanding stock was transferred to Frank Zuber, so that at all times actual control of the Z. & M. was exercised by Frank Zuber.

Prior to September 20, 1929, the Z. & M. had distributed Texas products under written agreements or contracts, which were changed or modified from time to time. On that date two writings, which are the bases of this litigation, were executed by the parties. They consisted of an agreement which is referred to herein as an "option agreement" or "option," to which was attached a "sales contract," whereby the Z. & M. agreed to purchase its requirements of gasoline, kerosene, oils, greases, and other petroleum products for a period of three years, and thereafter, until terminated by either party on one

hundred twenty days' notice prior to the end of any yearly period. The sales agreement provided in detail for the price to be paid for such products based upon the "tank wagon" market price, less varying margins, which would accrue to the benefit of the Z. & M. The sales contract also provided that Texas shall allow to the purchaser each month an additional sum not to exceed two cents per gallon, which the Z. & M. might be compelled to grant to dealers by reason of "price wars" within the area where the Z. & M. distributed its products.

The option agreement, which is the basis of this litigation, recites as a consideration the signing by Texas of the sales agreement above described and the mutual promises of the parties. It provides that Z. & M. grants to Texas the right and option to purchase the land, buildings, structures, facilities, improvements and equipment owned and used by it or its customers in the business of selling petroleum products. Also, the leasehold or other interest in land which was so used but not owned by the Z. & M. The consideration to be paid by Texas for the property above mentioned was to be such price as the American Appraisal Company shall fix as a fair value therefor, or, if such price were unsatisfactory to either party, then it may be fixed by negotiation or arbitration. The Agreement further provided that the appraisers and arbitrators should appraise the real estate upon the basis of conservative value at the time of the appraisal, and the personalties on the basis of cost, less depreciation and replacement value. The value of Z. & M.'s going business, good will, trade-mark or trade names should not be taken into account, it being understood by both parties that proper compensation for the value of those items was given by Texas to the Z. & M. in the sales agreement.

The agreement further provided that at any time during which the option may be exercised the Z. & M. upon request of Texas, shall furnish to the American Appraisal Company all pertinent information to enable a complete appraisal to be made; the cost of the buildings, structures, improvements and all personalties shall be furnished. The original purchase price of any land need not be disclosed.

The Appraisal Company shall furnish to both parties an itemized appraisal of the property. Such appraisal might be objected to by either of the parties, or, if no objection be made, then same shall be deemed satisfactory. Texas was not required to exercise the option at the appraisal price, in which event the option still continued in force, but if it desired to exercise it and the parties failed to agree upon the price after appraisal and negotiation, then a procedure whereby the price was to be determined by arbitrators to be selected was outlined in the agreement.

The agreement provided that the option "* * * shall be a continuing option * * *," and may be exercised during the term of the sales agreement "* * * or any renewal or other agreement in lieu thereof," after the expiration of the first three years thereof. It may be exercised any time after the first year, in the event that the Z. & M. should receive a bona fide offer of purchase.

In the event of the death of Frank Zuber during the first three years of the sales agreement, Texas shall be obligated to exercise the option, and appoint a manager whose salary and expenses shall be paid by Texas, and who shall operate the business of the Z. & M. until the actual conveyance of the property.

It was also provided, in the event the option were exercised, that the Z. & M. shall not engage in the business of distributing or selling petroleum products within a radius of twenty-five miles of nine certain distributing points, all in the state of New York, for a period of ten years, and a similar agreement was signed by Mr. Zuber personally.

On September 18, 1929, the directors of Z. & M. adopted resolutions authorizing the execution of a sales contract, and authorizing the granting of an option to Texas to purchase the properties of the Z. & M. described in the option agreement.

On September 23, 1929, a special meeting of stockholders was held at which all of the stockholders were present in person or by proxy (Mary and Joseph Zuber present by proxies). They unanimously adopted resolutions identical with the resolutions adopted by the board of directors. They read as follows:

"Whereas, the Directors of this corporation, at a meeting duly called and held on the 18 day of Sept. 1929, passed the following resolution:

"Resolved, that Frank Zuber, President, and Mary H. Laden, Secretary, be and hereby are authorized and empowered to sign, seal, attest and deliver, respectively, on behalf of the Company, an agreement with The Texas Company whereby The Texas Company agrees to sell and deliver and the Z. & M. Independent Oil Company, Inc. agrees to buy, receive and pay for Z. & M. Independent Oil Company, Inc.'s requirements of petroleum products at Norwich, Rome, Oneida, Cazenovia, Hamilton, New Berlin, Auburn, Geneva and Penn Yan, all in the State of New York, at the following prices:"

(Then follows a written schedule of prices of motor lubricants, oils and greases, kerosene and gasoline)

"Resolved, further, that the same parties be and hereby are authorized, on behalf of the Company, to sign, seal, attest and deliver, respectively, an agreement whereby The Texas Company acquires an option to purchase all of the real estate, buildings, structures and improvements thereon, and facilities, equipment and other personal property, owned or used by the Z. & M. Independent Oil Company, Inc. in its business of distributing petroleum products at the points above mentioned at the time of the exercise of said option, the price to be ascertained by appraisal and negotiation; or, in event of failure to arrive at a proper price by appraisal and negotiation, at a price to be fixed finally by arbitration; and whereby The Texas Company is obligated to exercise said option on the terms and conditions above stated and Z. & M. Independent Oil Company, Inc. is obligated to sell and deliver said properties to Texas, in event of the death, within three years from the date of the first agreement hereinabove mentioned, of Frank Zuber, who at present is President of the Z. & M. Independent Oil Company, Inc."

The evidence shows that beginning with the date of the two agreements above described and continuing until April, 1944, both parties considered that the agreements above referred to were in full force and effect. From time to time the sales agreement was modified, altered or changed, in that the margins or discounts allowed to the Z. & M. from the established tank wagon or posted price was changed to meet market conditions and new products were included. Invariably such changes were made by letter, and it was provided that the sales contract and option agreement should remain in full force and effect.

Under date of February 17, 1930, the Texas company forwarded to the Z. & M. an appraisal agreement entered into by Texas and the American Appraisal Company, which was approved by Z. & M. That agreement provided that building structures, facilities, and all other improvements and all personalties should be appraised upon the basis of cost, less depreciation, while the so-called "option agreement" provided that personalties should be appraised upon the basis of cost, less depreciation and replacement values. Texas requested that permission be given to change the option agreement with the Z. & M. to coincide with the appraisal agreement. This authority was granted by the Z. & M. on February 22, 1930. Actually no physical change in the option agreement was made by the parties.

On December 27, 1941, the Z. & M. notified Texas in writing that it elected to terminate all sales contracts and the option agreement effective as of June 30, 1942. A letter written under the same date by the Z. & M. expressed the desire to enter into negotiations for a new sales agreement. After some negotiation the cancellation of the sales contract and the option agreement was withdrawn by Z. & M. and same were extended to June 20, 1944, and from year to year thereafter.

It was further provided in a writing dated July 1, 1942, that Texas shall not have the right to exercise the option until June 30, 1944, or on the expiration of the six months following the termination of the war between the United States and Germany and Japan. Other changes were made in the sales contract which related for the most part to the price to be paid for Texas products, and the writing provided that except as specifically stated therein "— all of the other terms and conditions of agreements and modifications and said purchase option shall remain in full force and effect."

On April 28, 1944, all of the stock of the Z. & M. was transferred to the name of Frank Zuber, and he sold same to the Gulf Oil Corporation on that date, although he remains as president of the Z. & M. corporation. On August 28, 1944, Texas was advised of the sale of defendant's stock to the Gulf Oil Corporation. On August 29, 1944, it caused to be mailed to the Z. & M. a letter, the body and signature of which read as follows:

"Gentlemen:

"Pursuant to agreement between us dated July 6, 1942, and that certain option agreement between us dated September 20, 1929, you are hereby notified that The Texas Company exercises the option contained in said agreements to purchase all of the lands, buildings, structures, facilities, leaseholds, and other properties referred to in the option agreement of September 20, 1929, on the terms and conditions therein referred to.

"In accordance with paragraph "Third" of the option agreement of September 20, 1929, demand is hereby made upon you by The Texas Company to furnish it with a complete statement showing

"(a) all real estate owned or leased by you and used by you in your business of distributing, storing, handling, and/or selling petroleum products.

"(b) all buildings, structures, and improvements situated on said land,

"(c) personalty, wherever situated, and being used by you in the business above mentioned, and

"(d) the value of each item of real estate and personalty, and of each of said buildings, structures and improvements.

"Very truly yours,

"The Texas Company

"By H. W. Dodge

"Vice President"

A reply thereto addressed to Texas dated September 20, 1944, was received from Z. & M. the body and signature of which is quoted as follows:

"Dear Sirs:

"We acknowledge receipt of your letter of August 29, 1944.

"We deny the existence of any option agreement which gives you the right to purchase all the land, buildings, structures, facilities, leaseholds and other properties of this company.

"Very truly yours,

"E. & M. Independent Oil Co., Inc.,

"Z :A       President"

Under the same date the Gulf Oil Corporation also replied in writing to the letter from Texas dated August 29, 1944, which is similarly quoted as follows:

"Dear Sirs:

"With reference to your letter of August 29, 1944, addressed to our wholly-owned subsidiary, Z. & M. Independent Oil Co., Inc., we wish to advise you that we know of no option agreement giving you the right to purchase all of the land, buildings, structures, facilities, leaseholds, and other properties of that company, and, as the owner and holder of all of its outstanding ᴎares of stock, we do not consent to such a sale.

"Receipt of your letter of August 29, 1944, is being acknowledged by the Z. & M. Independent Oil Co., Inc.

"Very truly yours,

"Gulf Oil Corporation

"By Sgd. E. Waldo Emerson

"EWE M        Division Manager"

Evidence was offered and received to show that the Z. & M. received a money consideration through the provisions of the sales agreement sufficient to support the option agreement and to meet the defense that the agreement by its terms was harsh and

inequitable and, therefore, unenforceable in equity.

A discussion of this evidence is not necessary. Profits accruing to the Z. & M. by reason of the existence of the option agreement as distinguished from the profits which might accrue from the ordinary distributor's sales agreement alone are not capable of accurate mathematical computation, but there is abundant proof to conclude that the Z. & M. did receive a good and sufficient consideration for the execution, delivery and continued effectiveness of the option agreement by reason of increased margins allowed to it on TEXAS products, and unusual contractual provisions designed for its benefit.

Texas claims in this litigation that it is entitled to a decree of this Court directing that the so-called option agreement be specifically enforced.

Z. & M. raises by its answer certain defenses:

(a) That the consent of the stockholders of the Z. & M. to a sale of its assets was not given as required by Section 20 of the Stock Corporation Law of the State of New York, Consol.Laws, c. 59.

(b) That the changes in the option and sales agreement were not authorized by the stockholders nor is their consent thereto given in accordance with the provisions of the Stock Corporation Law.

(c) That the option agreement lacks mutuality of obligation.

(d) That same is not enforceable by specific performance because the price to be paid is to be fixed by arbitration.

(e) That the endorsement of the option agreement would be harsh and inequitable.

These contentions, based for the most part upon principles of law rather than upon disputed questions of fact have been exhaustively briefed and argued by the attorneys for both parties. The briefs submitted contain over three hundred printed pages, and the defendant cites over one hundred fifty cases to support its contentions. It is apparent that they can not be discussed in detail if the length of this opinion is to be retained within reasonable limits.

The Stock Corporation Law of the State of New York, Section 20, provides in substance that a stock corporation, as is this defendant, may sell its property with the consent of the holders of record of two-thirds of outstanding shares of stock; such consent to be obtained at a meeting of stockholders called for that purpose. The above section of the Stock Corporation Law has been amended since 1929, but the amendment refers to the rights of dissenting stockholders and does not affect the proposition under consideration.

A corporation, being a creation of statute, has only the powers granted to it by law. It follows, therefore, that the Court can not decree specific performance in this case, unless the requirements of the statute are complied with.

The purpose of the legislation is well expressed in the Matter of Timmis, 200 N.Y. 177, 93 N.E. 522, and it is not disputed that its provisions are applicable to the sale of the property of the Z. & M. in this case.

The question to be determined is whether or not the consent of the stockholders of the Z. & M., as evidenced by the resolution adopted at the meeting of September 23, 1929, was a consent to the sale and conveyance of its property within the meaning of the Stock Corporation Law above referred to.

The consent of the stockholders to sell, pursuant to a contract already made, is in compliance with the statutory provision. Neponsit Holding Corporation v. Ansorge, 215 App.Div. 371, 214 N.Y.S. 91. No point is made that the agreement was in fact entered into on September 20, 1929, which was three days before the stockholders' meeting. Rather, it is urged that the consent granted is a consent to offer for sale, not a consent to the sale itself.

An examination of the option agreement shows that it is not in the form of the ordinary option, which is defined by the courts in different phraseology, but in general it may be considered as an offer to sell, irrevocable for a period of time, supported by a consideration. It is unilateral in its obligation. It ripens into a contract only when and if the offer is accepted. In the

case of Benedict v. Pincus, 191 N.Y. 377, 84 N.E. 284, the Court discusses the form and purposes of an option and recites the obligations created thereby.

Here, the agreement is bilateral in form, indicating mutual obligations binding on both parties. It creates both actual and contingent obligations binding the parties thereto. It limits in time and circumstance the exercise by the parties of the rights granted therein. It contemplates the passage of an indefinite period of time during which the agreement is to remain in force. It attempted to provide protection to the parties in a business relationship which had existed for some years, and which both parties contemplated at the time would continue into the indefinite future.

The defendant urges, however, that an option to sell is not a contract of sale; that it covers no interest in the property subject to the option. Neponsit Holding Corporation v. Ansorge, supra. And that, therefore, consent to an option is not a consent to a sale or conveyance within the meaning of the Stock Corporation Law. While the parties have cited numerous cases which they claim are expressive of legislative intent, no authority has been cited where the question has been directly passed upon.

■ If an owner offers property for sale, it implies his power and willingness to convey same, and the acceptance of the offer creates a binding contract. If stockholders can consent to a contract of sale already executed, why can they not consent that a contract of sale be made in the future on terms presently within their knowledge? An option is not a contract of sale, but by giving their consent to the execution of the agreement, the stockholders had the knowledge that the offer could be turned into a contract of sale by the act of Texas over which they had no control. No further action on their part was required. When the stockholders consented to offer the corporate assets for sale, their act was meaningless or deceitful, unless their willingness to sell and convey is implied.

A corporation may offer its property for sale subject to the obtaining of the necessary statutory approval of the stockholders; that is, the stockholders may either accept or reject the consideration offered, and the terms of payment. It would seem equally clear that in the first instance the stockholders may define both the consideration and terms of payment, and that such definition would satisfy the statutory requirements when and if the offer is accepted.

The language of the statute is silent as to the time the consent of the stockholders must be obtained, except that it must be obtained *before* the sale or conveyance is made; neither does it provide the manner in which such consent is expressed. Catholic F. M. Society v. Oussani, 215 N.Y. 1 at page 7, 109 N.E. 80, Ann.Cas.1917A, 479.

Defendant has cited a great many cases which deal with the question of the rights of dissenting stockholders, arguing therefrom that the consent of the stockholders is ineffective, because a dissenting stockholder could not have his stock appraised until the agreement became a sale by the exercise of the option. These cases are not helpful to the question under consideration. Here, there are no dissenting stockholders, but the procedure to be followed by dissenting stockholders is indicated in Matter of Goelet, 289 N.Y. 735, 46 N.E.2d 349, affirming 264 App.Div. 759, 34 N.Y.S. 2d 863, where an option was granted with the consent of two-thirds of the stockholders over the objection of petitioners. The option was later exercised. See also Matter of Thomas, 259 App.Div. 736, 18 N.Y.S.2d 314.

Defendant also cites cases which hold that an option is not a contract of sale and, therefore, the statutory consent is not required to validate same, such as Bradford v. Sunset Land and Water Co., 30 Cal.App. 87, 157 P. 20, and Seeburg v. El Royale Corp., 54 Cal.App.2d 1, 128 P.2d 362. The principle of those cases is not in controversy here. In fact, the rationale of some of them supports plaintiff's contention here. See Trulock v. Kings County Iron Foundry, Inc., 216 App.Div. 439, 215 N.Y.S. 587.

It is inescapable that both plaintiff and defendant over the period from 1929 to 1944 believed and understood that the agreement as executed created a binding

obligation upon the part of the Z. & M. and its stockholders to sell and convey its property, if the option were exercised by Texas. Zuber's reference to the option, to-wit, "* * * that they had a rope around my neck for fourteen years and I wanted to get it off * * *" leaves no doubt as to the understanding of the stockholders of its purpose and effect. The evidence shows that it was not until the Gulf Oil Company examined the papers that there was any doubt on the part of the Z. & M. as to its obligations under the so-called option agreement.

The conclusion is reached that the consent of the stockholders of the Z. & M., as expressed in the resolution of September 23, 1929, satisfies both the letter and spirit of the Stock Corporation Law of the State of New York, and is sufficient to support the contract of sale resulting from the exercise of the option by Texas.

It is urged that the option agreement as executed contained provisions detrimental to the Z. & M. and not within the authority of the resolution adopted by the stockholders. Two of such provisions are referred to briefly.

The agreement provides that (a) the value of Z. & M.'s going business, good will, trade-marks or trade names should not be considered in fixing the price to be paid in the event the option was exercised, as it was understood by both parties that proper compensation for those items had been given in the sales agreement; and, (b), the Z. & M. was prohibited for a period of ten years from engaging in the business of selling petroleum products within a certain limited area, in the event of the exercise of the option by Texas.

The contention is not impressive when it is realized that it is not advanced by the stockholders for whose benefit the statute was passed. The defendant was not misled or defrauded. It was a party to the agreement. It had knowledge of the language and purpose of the resolution. After receiving the benefits of the contract and recognizing its validity from 1929 to 1944, it can not now be heard to question the validity of its own acts.

Apart from the question of actions which might amount to an estoppel, an examination of the resolution discloses that the consent of the stockholder did not limit the officers to the execution of a contract in which all of the precise terms were outlined. Frank Zuber and Miss Laden, who at that time owned about five-sixths of all outstanding stock, had in fact executed the option agreement about three days before the meeting of stockholders was held. Zuber's own evidence as to his explanation of the transaction to the stockholders, and the knowledge of his wife and daughter of the business affairs of Z. & M. justifies the conclusion that the stockholders, in passing the resolution, acted with knowledge of the terms of the option agreement as executed, or that they intended to rely upon the business judgment of Frank Zuber as to all terms of the contract or obligations created therein not specifically described in the resolution itself. Greenpoint Sugar Co. v. Whitin, 69 N.Y. 328; Lincoln Sterling Corp. v. State Theatre Dunkirk, Inc., 256 App.Div. 1035, 10 N.Y.S.2d 813.

Defendant contends that, even if the action of the stockholders on September 23, 1929, be considered as sufficient consent to satisfy the requirements of the statute as to a sale and conveyance of the property of the Z. & M., by reason of two changes in the option agreement on February 17, 1930, and June 29, 1932, and the numerous changes in the sales agreement, the options must be considered of no further force and effect, because it is conceded that the consent of the stockholders of Z. & M. was never obtained prior to or at the time the changes were made, nor did they at any time ratify same.

The changes in the sales agreement in no way affected the validity of the option. There were altogether about sixteen of such changes and they refer to the prices of gasoline products, the addition of new products, or to new point or places of shipment and distribution of merchandise.

The resolution of the stockholders of September 23, 1929, was an independent authorization for the execution of the so-

called option agreement. While no doubt the stockholders contemplated that a sales agreement would be entered into in accordance with their first resolution, they must also have contemplated that the price of petroleum products would fluctuate with market conditions. Nowhere in the resolution is it indicated that the consent of the stockholders was granted upon the condition that the sales agreement was not subject to modification or extension. Neither the resolution authorizing the execution of the sales contract nor the resolution authorizing the execution of the option agreement limited in any manner the duration of the sales agreement, and if we turn to the option agreement itself, we find that it recites as a consideration the execution of the sales agreement and the mutual promises of the parties. Both of these considerations were real. The language of the option agreement itself refers to the sales agreement "or any renewal or other agreement in lieu thereof." What has been said above with reference to the knowledge and understanding of the stockholders as to the contents of the option agreement is applicable here, and it follows that the resolution of the stockholders contemplated that the sales agreement was subject to modifications and additions, as circumstances required.

On February 17, 1930, about five months after the consent of the stockholders was given, the parties by letter attempted to change the manner or standard of valuation which was to be used in the making of an appraisal should the option be exercised by Texas. The change, which was made entirely by correspondence and not physically made in or attached to the option agreement, consisted of providing that all buildings and personalties were to be appraised on the basis of cost less depreciation rather than as stated in the option upon the basis of cost less depreciation and replacement values.

Defendant contends that · such attempted change without the consent of the stockholders was substantial and voided the option agreement. Plaintiff urges that inasmuch as the resolution of the stockholders did not prescribe the manner in which the properties were to be appraised or the standard of valuation to be used therein, such change was merely a change in detail which the stockholders left to the discretion of the officers of the company, and that such change was fully within the stockholders' authorization.

Having exercised their authority under the stockholders' resolution, the officers had no further power. Their authority was exhausted. The power to execute and deliver a contract does not imply authority to modify it. The attempted modification of the option agreement of February, 1930 is ineffective. Dudley v. Perkins, 235 N.Y. 448, 139 N.E. 570.

Under date of December 27, 1941, Z. & M. notified Texas in writing that it elected to terminate all sales contracts and the option agreement effective as of June 30, 1942. As the result of negotiation and correspondence the effective date of such cancellation was extended, and on July 6, 1942, such notice of cancellation was withdrawn and both the option and sales agreements were extended in full force and effect until June 30, 1944, and from year to year thereafter.

As far as the option contract was concerned, Z. & M. was given certain rights to terminate same, and Texas agreed that it would not exercise the option for a two-year period unless the war between the United States and both Germany and Japan came to an end prior to that time, in which event the option might be exercised at any time after the first six months period immediately following the cessation of hostilities.

This change, as far as material, consisted only of a forbearance on the part of Texas. It required no action on the part of Z. & M. nor its stockholders. It is immaterial to the matters in dispute in this litigation, and it is sufficient to say that it in no way invalidated the option agreement of September 20, 1929.

The changes in the sales agreement and the attempted change of February, 1930, and July, 1942, in the option agreement did not interfere with the validity of the op-

tion agreement as originally executed, and the attempted change in the matter of the valuation of the personalties as evidenced by the correspondence of February, 1930, was ineffective.

It is urged that, as Article "Fourth" of the option agreement fails to obligate Texas to exercise the option either at the time the preliminary information is demanded under the terms of sub-division "(1)" or upon receipt of the appraisal itself, there is, therefore, such a lack of mutuality of obligation and remedy as to require that a decree of specific performance be refused.

It is recognized by both parties that an enforceable option agreement ordinarily is unilateral at the time of its inception and that mutuality of obligation and remedy is required to exist only when the option is exercised.

Neither is there any dispute that the mutuality of obligation and remedy require that there must be now available to both plaintiff and defendant the remedy of specific performance if the Court is authorized to decree such performance upon the request of the plaintiff. Electric Man. & Eng. Corp v. United P. & L. Corp., 8 Cir., 19 F.2d 311; Mutual Life Ins. Co. v. Stephens, 214 N.Y. 488, 108 N.E. 856, L.R.A. 1917C, 809.

The agreement as drawn contemplates certain preliminary action on the part of the parties before Texas may exercise the option; to-wit, it provides for the furnishing of information by Z. & M. upon which an appraisal may be based, and for an actual appraisal by the appraisal company. It permits objection to the price of any specific item listed in the appraisal by either party. It is perfectly clear that the purpose of the prerequisites is to afford the parties some information as to the price to be paid by Texas should the option be exercised.

In the letter of August 29, 1944, set out above, Texas attempted to do two things. It demanded that Z. & M. furnish the information upon which the appraisal company could base an appraisal, and which is referred to in Paragraph "Fourth", Subdivision "(1)" of the option agreement, and it " * * * exercises the option * * *."

Z. & M. and its sole stockholder, the Gulf Oil Corporation, replied to the letter, and in substance denied the existence of any such option agreement. In the amended complaint the plaintiff alleges a willingness and ability to perform the terms of the option agreement, to make payment for the properties described therein, and tendered such performance and payment. It is hardly conceivable that the plaintiff could do more to obligate itself and to bring about the mutuality of obligation and remedy which the law requires.

"He had accepted the offer and had agreed to perform according to the express terms of the contract. Further or different tender was unnecessary, for equity will not require the performance of a useless act." Cochran v. Taylor, 273 N.Y. 172 at page 183, 7 N.E.2d 89, 93.

"The assignee, by the very act of invoking the aid of equity, assumes the duty of performance, and subjects himself to any conditions of the judgment appropriate thereto." Epstein v. Gluckin, 233 N.Y. 490 at page 493, 135 N.E. 861, 862.

If the existence of a contract be denied and one of the parties refuses to perform an act which is preliminary to the valid action of the party making the demand, he can not now be heard to object to the legal sufficiency of the action taken which ignores the contemplated preliminaries thereto.

Texas by the actual exercise of the option must be held to have waived the benefit of the preliminary steps.

Under the facts and pleadings in this case Texas has exercised the option and has bound itself to the full performance of its obligations thereunder, and has thereby supplied the mutuality of obligation and remedy which the law requires.

"The contract was reasonably certain in its terms, its subject matter, its purposes, and its parties. By acceptance, it became mutual in its obligations and its remedies. Upon the defendant's refusal to perform, the contract was enforceable by the assignee in an action for specific performance * * *." Cochran v. Taylor, 273 N.Y. 172 at page 184, 7 N.E.2d 89, 93; Montgomery

Trac. Co. v. Montgomery L. & W. P. Co., 5 Cir., 229 F. 672.

The option agreement by its terms provides that should the option be exercised by Texas it should pay as a consideration for the property transferred a price which the appraisal company should fix " * * * as the fair value of said property." If same be unsatisfactory to either party, *such price* may be fixed by negotiation or arbitration. If the appraisal is made, or if arbitration is resorted to, then the values of the real property is to be determined on the basis of conservative value, and the personalties on the basis of cost, less depreciation and replacement value.

█ Defendant urges that such provision prohibits this Court from decreeing specific performance herein, by reason of the fact that specific performance of a contract will not be decreed where the performance of the contract can not be enforced except through the medium of arbitration. The general rule is stated in Red Cross Line v. Atlantic Fruit Co., 264 U.S. 109 at page 180, 44 S.Ct. 274, 68 L.Ed. 582.

The rule above stated only applies where the matter to be arbitrated is an essential, rather than an incidental element of the contract, and it further is inapplicable where the contract is partially performed. Castle Creek Water Co. v. City of Aspen, 9 Cir., 146 F. 8, 8 Ann.Cas. 660; Wichita Water Co. v. City of Wichita, 8 Cir., 280 F. 770 at page 778.

█ The instant case comes within *both of the above mentioned exceptions.* The price to be paid is the fair value; the medium of ascertaining same may be by appraisal, negotiation or arbitration. The yardstick of value is prescribed both as to real and personal property. The essential is that a price representing the fair value be fixed, which will be the sale price. The alternative methods of computation are merely incidental. The option agreement and the sales agreement are closely related. In fact, the option recites that the value of the good will, trade-marks and trade names of Z. & M. has been fully compensated for in the sales agreement. The history of the dealings of the parties shows plainly that Texas at all times insisted that both contracts be kept in force, and that it recognized that in the concessions of the sales agreement it had in fact paid for the good will of the Z. & M. which could only be realized upon if the option were exercised. Texas had promoted the sale of its products in the Z. & M. territory through the instrumentality of Z. & M. This may have been of benefit to Texas but it was also a benefit to Z. & M. It appears also that Texas made extra concessions in the matter of price differentials to Z. & M. and granted to Z. & M. contractual benefits, by reason of the fact that it held an option upon the property of Z. & M. It is only when the contract is executory and the price to be fixed by arbitration that the Courts have refused the remedy of specific performance, upon the theory that no harm has been done and the parties can be placed back in their original position. Here the *status quo* can not be restored. The parties can not be put back in the position in which they were in 1929. No one can now compute the defendant's gain or plaintiff's money loss occasioned by reason of the mutual understanding of both parties that the option agreement was valid and enforceable.

The provisions of the option agreement relative to the method to be used in determining the price to be paid by Texas do not constitute a bar to a decree of specific performance. Gunton v. Carroll, 101 U.S. 426, 25 L.Ed. 985; Cold Metal Process Co. v. United Eng. & F. Co., 3 Cir., 107 F.2d 27, and cases cited; Matter of Fletcher, 237 N.Y. 440 at page 448, 143 N.E. 248; Williams v. Cow. Gulch Co., 8 Cir., 270 F. 9.

The case of Simmons Co. v. Crew, 4 Cir., 84 F.2d 82, holds no contrary doctrine. The majority held in that case that the matter to be arbitrated was an essential part of the contract, although Judge Parker registered a vigorous dissent. The contract involved personalty alone. Here, the matter to be arbitrated is held to be incidental rather than essential, and both real estate and personal property are involved.

█ The equities in this case are strongly in plaintiff's favor. The contention that the agreement should not be enforced in equity because such enforcement would be harsh and inequitable, therefore, need not be discussed.

In view of the decision reached, neither is it necessary to discuss the question of estoppel which has been urged by the plaintiff and briefed by both parties.

█ In arriving at the decision herein the Court has had in mind that this is an action in equity which has broad powers to prevent injustice; that the contentions of defendant relative to the applicable statute law are not raised by one for whose protection the statute was enacted; that the defendant was dominated and controlled by Frank Zuber who shaped its business policies; that the validity and effectiveness of the agreement in question was recognized and acted upon over a period of approximately fifteen years; that the repudiation of the contract by the defendant came about through the intervention of business competition; that the present owner of all stock of Z. & M. had full knowledge of the contents of the option agreement and of the facts and circumstances of the execution and continued existence thereof; and that defendant has received and retained benefits by reason of the recognized validity of the agreement.

The plaintiff is entitled to the relief requested, and the counterclaim of the defendant, which seeks to enjoin the plaintiff from soliciting the business of distributors of Z. & M. products, is dismissed.

Under the conditions existing in this case there is ample authority for the Court, or a special master appointed by it, to determine the fair value, which shall be the sale price of the property covered by the option. See cases last above cited.

Plaintiff has made a part of its prayer for relief in the alternative; that is, it seeks either a decree of specific performance or a judgment declaring the rights of the parties. Unless the parties agree upon the form of the decree herein, same will be settled upon five days' notice.